David J. CHECKOSKY, Norman A. Aldrich, Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent,

In re Application of David J. CHECKOSKY and Norman A. Aldrich for the Perpetuation of Certain Testimony and the Preservation of Other Evidence,

In re David J. CHECKOSKY and Norman A. Aldrich, Petitioners.

Nos. 92–1396, 92–5158, 92–1214.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 26, 1993.

Decided May 20, 1994.

---

Geoffrey F. Aronow, Washington, DC, argued the cause for petitioners. With him on the briefs was Andrew T. Karron, Washington, DC. Jay Kelly Wright and Samuel A. Thumma, Washington, DC, entered an appearance.

Susan Ferris Wyderko, Asst. General Counsel, S.E.C., Washington, DC, argued the cause for respondent. With her on the briefs were Paul Gonson, Sol., Richard M. Humes, Attorney, Paul P. Andrews, Sr. Counsel, and Richard H. Walker, Regional Adm'r, S.E.C., Washington, DC. Jeffrey R. Zuckerman and Henry Klehm, III, Attorneys, S.E.C., Washington, DC, entered an appearance in Nos. 92–5158 and 92–1214. James Robert Doty, Washington, DC, entered an appearance in No. 92–1396.

Kathryn A. Oberly, Washington, DC, was on the brief for amici curiae Arthur Andersen & Co.; Deloitte & Touche; Ernst & Young; and KPMG Peat Marwick.

Arthur F. Mathews and Michael R. Klein, Washington, DC, were on the brief for amicus curiae American Civil Liberties Union.

Before: SILBERMAN and RANDOLPH, Circuit Judges, and JOHN W. REYNOLDS,* District Judge.

Opinion PER CURIAM.

* Of the United States District Court for the Eastern District of Wisconsin, sitting by designation pursuant to 28 U.S.C. § 294(d).

Circuit Judge SILBERMAN filed a separate opinion.

Circuit Judge RANDOLPH filed a separate opinion.

District Judge REYNOLDS filed a separate opinion, concurring in part and dissenting in part.

PER CURIAM:

■ The case is remanded to the Commission for a more adequate explanation of its interpretation of Rule 2(e)(1)(ii) and its application to this case. The court rejects unanimously, as per Part V of Judge Randolph's opinion, petitioners' challenge to the regularity of the Commission's proceedings.

*So Ordered.*

SILBERMAN, Circuit Judge:

The Commission suspended petitioners, partners in a national accounting firm, for "improper professional conduct" under Rule 2(e)(1)(ii). As I cannot determine from the order just what the Commission is using as its standard for improper professional conduct, I think the appropriate course is to remand (which we do) for the Commission to clarify its position before we substantively review the order. *See Philadelphia Gas Works v. FERC,* 989 F.2d 1246, 1251 (D.C.Cir.1993).

**I.**

Savin Corporation, a publicly traded company that for many years had successfully marketed photocopiers built by other companies, decided in the late 1970s to develop its own machines—a failed effort that gave rise to this case. Between 1977 and 1985, Savin contracted with an inventor to design a machine, employed over 500 employees in its Engineering and Manufacturing division, and built and tested a number of prototypes of the various designs for the elusive copier. Faced with the mounting costs of the endeavor, Savin in 1980 explored ways that it could defer its expenditures as a capitalized asset instead of declaring them as ordinary business expenses. Generally accepted accounting principles (GAAP), however, do not permit research and development costs to be deferred: "All research and development costs encompassed by this Statement shall be charged to expense when incurred." ACCOUNTING FOR RESEARCH AND DEVELOPMENT COSTS, Statement of Financial Accounting Standards No. 2, ¶ 12 (Fin. Accounting Standards Bd.1974) [hereinafter FAS 2]. Savin in 1981 nevertheless formulated an accounting policy whereby it could define its expenditures related to the copier project not as research and development costs but rather as "start-up" costs, which the company believed could be "deferred and matched when normal production cycle is reached." Following the policy, the company deferred approximately $37 million from fiscal year (May 1 to April 30) 1981 to December 31, 1984.

David Checkosky was the engagement partner and Norman Aldrich was the audit manager for Coopers & Lybrand's audits of Savin's financial statements, which were all submitted to the Commission. Both consulted with Savin as the company developed its accounting policy's interpretation of FAS 2 that forms the core controversy of this case. Coopers & Lybrand, through Checkosky and Aldrich, issued audit reports for Savin's financial statements for fiscal years 1981 through 1983 which represented that the audits were conducted according to generally accepted auditing standards (GAAS) and which gave the auditors' unqualified opinion—*i.e.,* without reservations—that the statements were presented in conformity with GAAP. The audit reports for fiscal year 1984 and the period between April 30 to December 31, 1984, contained the auditors' opinion that the financial statements conformed with GAAP subject to one qualification: that Savin's deferred start-up costs would eventually be recovered after successful manufacture and marketing of the copier. Savin abandoned its plans to develop a new copier in 1985, having never manufactured or marketed a single machine.

In 1987, the Commission initiated this disciplinary proceeding against Checkosky and Aldrich for "improper professional conduct" in violation of the Commission's Practice Rule 2(e), 17 C.F.R. § 201.2(e)(1)(ii) (1993),

with respect to their audits of Savin.[1] The Commission alleged that Checkosky and Aldrich had misrepresented that the financial statements were in conformity with GAAP when they certified that Savin has properly deferred its costs associated with the copier project. Moreover, Checkosky and Aldrich had violated GAAS by failing to exercise professional due care in planning and performing the audits and in preparing the audit reports. The administrative law judge agreed that the auditors had violated Rule 2(e)(1)(ii) and suspended them from practicing in front of the Commission for five years. Despite contrary arguments from Checkosky and Aldrich, the ALJ held that "improper professional conduct" within the meaning of the Rule does not require scienter; their violation of GAAP and GAAS alone suffices. After an independent review of the record, the Commission affirmed the ALJ's conclusion that the auditors had violated GAAP and GAAS and that scienter is not required to state a violation of Rule 2(e)(1)(ii)—and noted that the auditors' conduct "did in fact rise to the level of recklessness." The Commission concluded that the auditors' conduct warranted only a two-year suspension and reduced the ALJ's sanction accordingly.

Checkosky and Aldrich petition for review of the Commission's order, arguing that it had no statutory authority to promulgate Rule 2(e). They claim further that the Commission's order is not supported by substantial evidence and, in any event, that Rule 2(e)(1)(ii) could apply only to willful misconduct of the sort that would constitute scienter for substantive violation of the securities laws. Petitioners also argue that alleged procedural improprieties in the Commission's decisionmaking process deprived them of due process of law, a contention that we reject

for the reasons stated in Part V of Judge Randolph's opinion which follows.

## II.

■ Petitioners' general challenge to the Commission's authority to issue Rule 2(e)[2]—entitled Suspension and Disbarment—has been addressed by two other courts, and I would add little to their well-crafted opinions. The Second Circuit in *Touche Ross & Co. v. SEC*, 609 F.2d 570 (2d. Cir.1979)—whose reasoning the Ninth Circuit adopted in *Davy v. SEC*, 792 F.2d 1418, 1421 (9th Cir.1986)—held that Rule 2(e) was validly promulgated under the Commission's " 'broad authority' to adopt those rules and regulations necessary for carrying out the agency's designated functions." *Touche Ross*, 609 F.2d at 580 (quoting *Commercial Capital Corp. v. SEC*, 360 F.2d 856, 857 (7th Cir.1966)). Inherent in this authority is the power to protect the integrity of the agency's administrative processes:

> Although there is no express statutory provision authorizing the Commission to discipline professionals appearing before it, Rule 2(e), promulgated pursuant to its statutory rulemaking authority, represents an attempt by the Commission to protect the integrity of its own processes. It provides the Commission with the means to ensure that those professionals, on whom the Commission relies heavily in the performance of its statutory duties, perform their tasks diligently and with a reasonable degree of competence. As such the Rule is "reasonably related" to the purposes of the securities laws.

*Touche*, 609 F.2d at 582 (citing *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973)).

---

1. Savin settled with the Commission in November 1985 and agreed to write off certain start-up costs it had previously deferred, restate its financial reports, and be enjoined from future violations of the securities laws.

2. The relevant provision states:
   (e) Suspension and disbarment. (1) The Commission may deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the Commission after notice of and opportunity for hearing in the matter (i) not to possess the requisite qualifications to represent others, or (ii) to be lacking in character or integrity or to have engaged in unethical or improper professional conduct, or (iii) to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws (15 U.S.C. 77a to 80b–20), or the rules and regulations thereunder.
   17 C.F.R. § 201.2(e)(1) (1993).

The Second Circuit relied on the line of cases which held that administrative agencies have the power, under their general rulemaking authority, to prescribe standards of practice for attorneys practicing before them and to discipline those who fail to conform. *See Goldsmith v. Board of Tax Appeals*, 270 U.S. 117, 122, 46 S.Ct. 215, 217, 70 L.Ed. 494 (1926); *Herman v. Dulles*, 205 F.2d 715, 716 (D.C.Cir.1953). And we have since reaffirmed this principle: "There can be little doubt that the Commission, like any other institution in which lawyers or other professionals participate, has authority to police the behavior of practitioners before it." *Polydoroff v. ICC*, 773 F.2d 372, 374 (D.C.Cir.1985).

Importantly, the court in *Touche* clearly distinguished the Commission's authority to discipline professionals from its substantive enforcement functions, *see* 609 F.2d at 579, since under the 1934 Act's jurisdictional provision, 15 U.S.C. § 78aa (1988), district courts have exclusive jurisdiction over violations of the securities laws. The Commission had promulgated Rule 2(e) not to augment its enforcement arsenal but to protect its administrative processes, and the court correctly recognized that the Commission may not "usurp the jurisdiction of the federal courts to deal with 'violations' of the securities laws." *Touche Ross*, 609 F.2d at 579. Rule 2(e), therefore, is analytically distinct from substantive provisions of the securities laws,[3] and cases which involve those provisions, *e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *SEC v. Steadman*, 967 F.2d 636 (D.C.Cir.1992), are inapposite to the question at hand.

Petitioners argue further that even if the Commission may police practitioners before it, its authority does not extend to disciplining professionals for negligence. If the purpose of Rule 2(e) is to protect the integrity of administrative processes, then sanctions for improper professional conduct under 2(e)(1)(ii) are permissible only to the extent that they prevent the disruption of proceedings. Punishment for mere negligence, so the argument goes, extends beyond this realm of protective discipline into general regulatory authority over a professional's work. This argument has not been squarely addressed by the courts of appeals, *see Davy v. SEC*, 792 F.2d 1418, 1422 (9th Cir.1986) (reserving judgment on the SEC's power to determine standards for discipline under the Rule).[4] But, as I discuss in Part IV, since it is unclear whether the Commission *actually applied* a simple negligence standard in this case—or, for that matter, what standard the Commission actually did apply—the question is not yet properly presented.

### III.

■ Since we remand for the Commission to clarify its opinion as to the standard of conduct it applied to petitioners, it might be thought premature to consider whether there is substantial evidence to support the Commission's determination that petitioners violated Rule 2(e). But, at minimum, the Commission must establish that petitioners misinterpreted GAAP and violated GAAS in the course of their audits. For the reasons Judge Randolph recites in Part III of his opinion, I agree that substantial evidence supports the Commission's conclusions in this regard, although I do not think the second question is as difficult as does Judge Randolph. There is, furthermore, somewhat more evidence against petitioners than is discussed in Judge Randolph's opinion.

For example, the Savin accounting policy, which was adopted in consultation with and certified by petitioners, prescribed a subjective standard for deferring development costs: when Savin reaches "a comfort level"

---

3. The court's analysis in *Touche Ross* differs in this respect from Judge Randolph's, which seems to conflate Rule 2(e) with substantive provisions of the Act, Randolph Op. at 469, 481, and improper professional conduct under the Rule's subclause (ii) with willful violation or aiding and abetting the violation of securities laws under subclause (iii). Randolph Op. at 484–85.

4. One district court has addressed the issue and held that *Davy* necessarily determined that the Commission's authority under Rule 2(e) extends to all mental states of culpability, since unprofessional conduct harms the Commission's processes regardless of the actor's intent. *See Danna & Dentinger v. SEC*, No. 94–126744 C–93–4158,

of marketability and when it "believes that the product will satisfy the customer." Such a standard, however, was explicitly considered and rejected by the Financial Accounting Standards Board when it adopted FAS 2, which employed a neutral criteria "that could be objectively and comparably applied by all enterprises." *See* ACCOUNTING FOR RESEARCH AND DEVELOPMENT COSTS Statement of Financial Accounting Standards No. 2, ¶¶ 53, 54 (Fin. Accounting Standards Bd.1974).

Moreover, I would specifically note several additional instances where Savin's copier program failed even petitioners' own benchmark for when the project passed out of research and development. Savin's accounting policy defined research and development to include "[d]esign, construction and testing or pre-production prototypes and models" and "[p]rototype pre-manufacturing activity." For all the relevant years, petitioners' own testimony and notes indicate that they considered the copiers to be prototypes and not manufactured, marketable products. During the 1981 audit, petitioners allowed Savin to defer costs incurred "after completion of first successful prototype (Nov. '80)." In 1982, petitioners observed a "working prototype" but inexplicably concluded that "the company was past the prototype stage." In 1984, the auditors' notes indicate that "final working prototypes had to be constructed." And the copiers—prototypes or otherwise—never met Savin's prescribed standards for quality and marketability. Savin's design specifications called for no more than 66 failures per million copies, and a 1983 report by McKinsey & Co. concluded that the copier's market viability depends on a failure rate of no more than 62 per million copies. In November 1982, the copiers were producing 1,900 failures per million copies. In April 1983, a new copier model registered 3,000 failures per million copies, and in March 1984, the copiers were performing at 700 to 1,000 failures per million copies.

Finally, I do not think (contrary to Judge Randolph) petitioners have much of an argument against the Commission's finding that they had failed to conduct their audits in accordance with GAAS. Independent auditors are charged with the responsibility of casting a skeptical eye on information they are required to verify. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 818, 104 S.Ct. 1495, 1503, 79 L.Ed.2d 826 (1984). In 1981, Checkosky made the crucial decision that Savin's expenses associated with the copier project were no longer research and development and could be deferred as start-up costs. Judge Randolph correctly notes that the basis for this decision was a visit to Savin's offices where Checkosky saw a working prototype making copies. But there is more that is left unmentioned. The audit papers for 1981 contain no documentation for the visit. Checkosky did not record what he saw, did not question whether the prototype—besides making copies—met other critical specifications, and made no other efforts to ascertain whether the copier was ready for manufacture.

Throughout its development, Savin's copier suffered obviously crippling defects. The prototypes had a habit of leaking thick black toner liquid onto the floor, at times forming a six-foot pool in front of the machine. And the copiers were hot. According to one testing engineer, the copier "could have been used as a furnace as well as a copying machine, because that's what it was." The problem was grave enough for the project's technical manager to be concerned that the copier would violate OSHA standards for office safety, but not enough to raise petitioners' vigilance. Petitioners counter that there is no evidence that they knew of the copier problems and that no auditing standards required them to seek such information independently. However, since the feasibility, reliability, and marketability of the copier are essential considerations even in petitioners' own interpretation of FAS 2, petitioners' claim that they had no duty to verify these factors in certifying that the costs were deferred properly under GAAP is tenuous.[5]

mem. op. at 3–4, 5 n. 2, 1994 WL 315877 (N.D.Cal. Feb. 8, 1994).

**5.** In any event, after the Commission's decision, Coopers & Lybrand produced to the Commission four additional boxes of personal and working files of the accountants engaged in the Savin audits. Among the documents newly discovered in the accountants' possession were 1984 progress reports to the Savin board which identified leaks in the fluid handling system as a problem.

## IV.

The Commission determined that petitioners violated GAAS and misrepresented that Savin's statements complied with GAAP. (The ALJ put it in terms of "violating" both GAAP and GAAS.) The Commission thus suspended petitioners, stating: "We affirm the law judge's holding (and reaffirm prior Commission precedent) that proof of bad faith or willful misconduct is not a prerequisite for the imposition of sanctions pursuant to Rule 2(e)(1)(ii) of the Commission's Rule of Practice." Nevertheless, the Commission's opinion is ambiguous. The Commission declared that bad faith is *not* a prerequisite for a violation, but does not specify the state of mind both necessary and sufficient to constitute a violation in light of its past precedents.

In *In re Logan,* 10 S.E.C. 982 (1942), the Commission suggested in *dictum* that good faith is a defense under subclause (ii) of the Rule: "[I]f the evidence showed that Logan in good faith held himself out as an independent accountant, we should not hold him ... to have engaged in improper and unethical professional conduct merely by reason of the fact that he was found to be not in fact independent." *Id.* at 985. Ten years later, without mentioning *Logan,* the Commission stated that good faith is *not* a defense under Rule 2(e), holding that discipline is warranted when the accountants' conduct is "so deficient" that it constitutes "their failure to give this professional undertaking the degree of care and inquiry it demanded under the circumstances." *In re Haskins & Sells,* Accounting Series Releases No. 73 [1937–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 72,092, at 62,197 (Oct. 30, 1952). But in *In re Carter,* [1981 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 82, 847, at 84, 145 (Feb. 28, 1981), after discussing at length the difficulties with prescribing a generalized standard of conduct for professionals who must exercise judgment in their work, the Commission appeared to return to the *Logan* standard: "So long as a lawyer is acting in good faith and exerting reasonable efforts to prevent violations of the law by his client, his professional obligations have been met." *Id.* at 84,172–73.

Faced with these conflicting precedents, the Commission failed to clearly choose its present position. The opinion below cited *Haskins & Sells* and *In re Schulzetenberg,* Admin.Proc. 3–6881, slip. op. at 2 (Nov. 10, 1987), for the proposition that good faith is not a defense (at least for an auditor) to a Rule 2(e) proceeding. But the Commission did not mention *Logan,* and distinguished *Carter* by noting that the case "explicitly acknowledged the differences in the duties attorneys owe to their clients and the duties auditors owe to the public." Other than asserting these differences, however, the Commission did not indicate why these differences were relevant to Rule 2(e) or—even if they are cognizable differentiations under the Rule—how the standard of conduct re-

Also found was an early version of the 1984 update to the McKinsey & Co. report, where Checkosky suggested several edits that would strike out potentially damaging references to technical problems associated with the development of the copier. For example, "[t]he technical risks of an unproven copier project" was changed to "the risks of a new copier project," and "the development team" to "the engineering team." And the following section was bracketed in the draft:

A year ago, the major risk was whether the *basic technical concept was sound.* The fuser concept had not been demonstrated and *no subsystems were even under test.* Given the high reliability and copy quality benchmarks, there were major concerns was to *whether the product was feasible.* With *prototypes now under test....*

(emphasis added). In the final McKinsey & Co. report, this language was replaced with:

As of March 1983 the major risk on the program was whether the 8000 concept as a system could meet the high reliability and copy quality benchmarks that were established as the requirements for commercial success. No working models incorporating all of the planned modifications to the earlier generation of machines (i.e., Diamond/Ruby) has as yet been built. Now, *as it has been explained to us,* with prototypes having been tested....

(emphasis added). Suffice it to say that the original version of the report was significantly less consistent with petitioners' theory of deferral than the final version of the report, although Checkosky explained *post hoc* that he corrected only "language errors." Of course, the Commission is free to consider this and other newly discovered evidence in reaching its decision on remand. *See Wisconsin Gas Co. v. FERC,* 770 F.2d 1144, 1165 (D.C.Cir.1985).

quired of accountants contrasts with that demanded of lawyers.[6] *See, e.g., United States v. Arthur Young & Co.,* 465 U.S. 805, 817–19, 104 S.Ct. 1495, 1502–03, 79 L.Ed.2d 826 (1984). In *Schulzetenberg,* a case involving auditors, the Commission did face the specific defense raised in this case that "mere negligence does not warrant disciplinary action under Rule 2(e)." The Commission rejected the claim with the statement, "We have always recognized that an incompetent or negligent auditor can do just as much harm to public investors and others who rely on him as one who acts with an improper motive."[7] But *Schulzetenberg,* astonishingly, was unpublished. As such, it is, of course, not acceptable authority under the APA, and thus it cannot provide the necessary indication of the Commission's interpretation of "improper conduct" as applied to auditors. *See* 5 U.S.C. § 552(a)(2).

Significantly, the SEC never stated unequivocally that petitioners were negligent *and* that their negligent acts, without more, constitute a violation of Rule 2(e). It may well be fair to infer, as Judge Randolph does,[8] that a transgression of GAAS is itself negligence although the SEC does not explicitly so declare. In any event, the Commission never forthrightly articulated the standard it applied to petitioners. The closest that it came to doing so is its assertion, "Although *we have stated* that a mental awareness greater than negligence is not required to impose sanctions against an accountant pursuant to Rule 2(e) ..." (emphasis added). It is not at all clear, however, whether the Commission is referring to its precedent discussed above (which, as indicated, is by no means pellucid) or whether it means one should have derived that proposition from its earlier discussion of this case (in which it is never so stated *in haec verba*). Given its disparate precedent, what is missing from the Commission opinion is the flat declaratory statement that an accountant's negligence (a failure to comply with GAAP and GAAS) in performing an audit *will* constitute a violation of Rule 2(e)—a statement which the ALJ did make.

The Commission seems to be suggesting that its determination that an accountant violated Rule 2(e) can be defended in court if the accountant is negligent but, at the same time, is not necessarily committing itself to the proposition that *all* failures to comply with GAAP and GAAS will constitute Rule 2(e) violations, *i.e.,* that negligence alone *is* improper professional conduct. To be sure, the difference is a subtle one, but in light of the possible implications concerning the validity of Rule 2(e)(ii) if it is meant to sweep so broadly, it is a difference with enormous significance. If the Commission were to determine that an accountant's negligence is a *per se* violation of Rule 2(e), it would have to consider not only the administrative burden such a position would entail but also whether it would constitute a *de facto* substantive regulation of the profession and thus raise questions as to the legitimacy of Rule 2(e)(1)(ii)—or at least its scope. *See supra* at 456. (Perhaps the Commission's reluctance to take plainly that course explains why *Schulzetenberg* was never published.) It simply will not do for an agency to indicate that it has the authority to enunciate a proposition of administrative law—and to suggest that in the case before it the proposition, if it were adopted, would apply—without assuming the full administrative law burden of declaring the proposition.

And so, it does not seem to me that the Commission adopted the sweeping position that petitioners (and Judge Randolph) describe. Petitioners understandably attacked the Commission's opinion at its soft point and argued that the Commission embraced un-

---

**6.** If the Commission were to clearly adopt the position that simple negligence is improper professional conduct, it would be obliged to explain and reconcile these prior cases.

**7.** That language, tellingly, suggests that the Commission's reasons for considering an auditor's negligence to be "improper professional conduct" has more to do with protecting the public than the Commission's administrative processes.

**8.** Judge Reynolds, it seems to me, puts it more accurately by stating that "[t]he SEC found that [petitioners] were *at least* negligent...." Dissent at 494. The Commission only said that "Rule 2(e) applies to GAAP and GAAS violations without regard to scienter," which of course leaves unstated whether a mental state short of scienter but more than negligence is required.

equivocally the negligence standard for "improper conduct." The Commission's counsel also maintained before us that "the Commission has found that negligent conduct will give rise to discipline under the 'improper professional conduct' standard of Rule 2(e)(1)(ii)," which comes close to saying that an auditor's negligence *is* improper conduct. But, of course, we cannot credit an agency counsel's presentation of a position not clearly adopted by the agency.[9] *See KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1303 (D.C.Cir. 1992). The Commission itself appears to have assumed that it did not need to declare squarely that an accountant's negligent auditing is "improper conduct" because the Commission "note[d] that Respondents [sic] conduct in this case did, in fact, rise to a level of recklessness" ("noted" is a rather unusual term to introduce an alternative holding). The Commission, however, never analyzed the evidence to explain just how petitioners' conduct could be thought to pass beyond negligence to the greater degree of culpability—recklessness. Nor did the Commission specify just what meaning it was giving the term reckless: Did the Commission define recklessness as a "higher form of ordinary negligence" or as " 'a lesser form of intent' "? *SEC v. Steadman*, 967 F.2d 636, 641–42 (D.C.Cir.1992) (citation omitted).

The Commission's determination that petitioners were reckless—and that recklessness would constitute improper professional conduct whether or not negligence did—prevents us from holding that the Commission's *order* is arbitrary and capricious even if we were to conclude (as does Judge Randolph) that the Commission had squarely determined that an auditor's negligence was improper professional conduct. Obviously, we cannot hold an agency's action unlawful if one of two alternative grounds is an accept-

able basis to justify that action. It may well be that the essential substantive difference between Judge Randolph and myself lies in his conclusion that *under no circumstances* may the Commission rest its order on a determination that petitioners were reckless.

Petitioners do claim in a footnote (upon which Judge Randolph substantially expands) that recklessness is not now and cannot be an acceptable alternative ground for the Commission's suspension order, arguing that since the accusation of recklessness was not raised until after the proceedings in front of the ALJ, the Commission violated principles of due process and fair notice when it asserted that petitioners were reckless. *See In re Ruffalo*, 390 U.S. 544, 550–52, 88 S.Ct. 1222, 1225–27, 20 L.Ed.2d 117, *modified on other grounds*, 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1380 (1968). There is little to this argument. In *Ruffalo*, the Court held that an attorney may not be disbarred for engaging in a conspiracy to solicit clients where the *charge* of conspiracy was not added until after the defendant had testified. Here, the charge in the Commission's Order for Private Proceedings is that petitioners violated Rule 2(e)(1)(ii), and the Order did not specify the mental state required to state such a violation. Judge Randolph observes that the order provided that hearings "would be held *on the Chief Accountant's allegations*," presumably implying that the proceedings are thereafter limited to only those allegations. But the Chief Accountant did not assert, in his allegations, the degree of mental culpability with which petitioners acted. He only claimed that petitioners "failed to adhere to generally accepted auditing standards" and that their opinions "were not presented in conformity with generally accepted accounting principles." [10]

---

9. This principle, grounded in the teachings of *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) and *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), requires that courts adjudicate agency actions based solely on the grounds relied upon by the agency. Therefore, my reservations about considering arguments not advanced by the parties, *see Independent Ins. Agents of Am. v. Clarke*, 955 F.2d 731, 741–44 (D.C.Cir.1992) (Silberman, J., dissenting), are not relevant where the agency counsel attempts

to advance a *post hoc* rationalization of the agency's decision. And it follows *a fortiori* that petitioners cannot oblige us to adopt a characterization of the agency's holding.

10. Petitioners also maintain that the finding that petitioners acted recklessly is equivalent to a conclusion that they violated securities laws. The Commission did not charge petitioners with substantive violations, the argument goes, so it cannot make a finding of recklessness. But of course the Commission cannot and did not find

Petitioners' state of mind was specifically addressed when *petitioners* claimed before the ALJ that in order to state a violation of Rule 2(e), the Chief Accountant must show not only that they violated GAAP or failed to conduct the audit accordingly to GAAS, but that they did so with scienter. The ALJ said, "I reject respondents' position that scienter or bad faith conduct is required for the Commission to act under Rule 2(e)(ii).... Violations by accountants of GAAP and GAAS constitute unethical and improper professional conduct." Thus, having adopted the proposition that transgressions of GAAP and GAAS are, without more, a violation of 2(e) (in other words, negligence alone suffices), the ALJ had no need to consider the analytical terrain between the mental states of negligence and bad faith. Of course, it is blackletter administrative law that the Commission may find facts based on its own review of the record. Unlike a court of appeals reviewing a lower court decision, the Commission may undertake an independent review of the record in considering the ALJ's initial decision—and indeed did so in this case. Subject to certain parameters, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492, 496–97, 71 S.Ct. 456, 466, 468–69, 95 L.Ed. 456 (1951), the Commission may modify the factfinder's conclusions with adequate explanations therefor. Since the Commission (not the ALJ) is charged with the responsibility to suspend petitioners, the initial decision of the ALJ is of limited consequence.

In *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), the Supreme Court rejected a similar due process challenge where the defendant, a lawyer suspended from practice for deceptive advertising, argued that new allegations could not be raised after the initial proceedings: "That the Board of Commissioners chose to make its recommendation of discipline on the basis of reasoning different from that of the Office of Disciplinary Counsel is of little moment: what is

important is that the Board's recommendations put appellant on notice of the charges he had to answer to the satisfaction of the Supreme Court of Ohio." *Zauderer*, 471 U.S. at 654, 105 S.Ct. at 2283. Here, not only did petitioners have notice of the charge of improper professional conduct, they actually and vigorously litigated the specific question of mental culpability at every stage of the proceedings. *See id.* at 654–55, 105 S.Ct. at 2283–84. And the Court distinguished *Ruffalo* as a special instance of a prosecutorial "trap": "the very evidence put on by the petitioner in defense of the original charges became, under the revised charges, inculpatory." *Id.* at 655 n. 18, 105 S.Ct. at 2284 n. 18. There are no allegations of such bait-and-switch tactics here, and therefore the Commission appears to me to be—procedurally at least—free to determine that petitioners were reckless. The problem, as I have pointed out, is that the Commission did not clearly make such a determination (but merely "noted" it) and failed to set forth the facts upon which such a determination is based so that we could review their construction of Rule 2(e)(1)(ii) in light of these facts. Of course, were the Commission to decide on remand clearly to rest a holding (whatever it were to say about negligence) on petitioners' recklessness, petitioners could still challenge that basis for concluding they engaged in improper conduct, both legally and on the evidence.

In sum, petitioners' mental state was very much at issue in this case—certainly after petitioners themselves made it so. I rather doubt that the mental state with which they carried out the acts alleged to be misconduct could ever be thought to be, as Judge Randolph puts it, a "new charge." But surely petitioners cannot possibly claim that they were not on notice that their mental state was relevant to the case when they themselves sought to make it so. Nor can it be seriously argued that having claimed that the

petitioners guilty of substantive violations; they were charged *only* with improper professional conduct in violation of Rule 2(e)(1)(ii), which is legally and analytically distinct from substantive provisions of the securities laws. *See supra* at 456 n. 3. Our conclusion in *Steadman*, 967 F.2d at 641–42, that extreme recklessness could suf-

fice as scienter for substantive violations is therefore inapposite. It does not follow ineluctably that a finding of reckless conduct in violation of Rule 2(e)(1)(ii) is a decision that the securities laws have been violated. As I have noted, the Commission's order gives no hint as to what it means by "reckless."

SEC was obliged to prove scienter or bad faith, as opposed to mere negligence, petitioners were somehow surprised by the Commission's determination that their conduct amounted to recklessness—a characterization that lies between negligence and bad faith.

The Commission has variously indicated that different levels of mental culpability are needed to make out a 2(e)(1)(ii) violation by professionals (lawyers or auditors): simple negligence as the Commission privately held in *Schulzetenberg;* gross negligence implied by the "so deficient" language of *Haskins & Sells;* recklessness hinted by the Commission in its opinion below; or willfulness or bad faith suggested by *Logan* and *Carter.* I think the Commission must choose its standard and forthrightly apply it to this case. Given the enormous impact on accountants—and lawyers—that the Rule has, and in fairness to petitioners, the Commission must be precise in declaring the standard against which petitioners' conduct is measured and exactly why that conduct violated the standard. Nor should we be asked to determine whether the Commission had the authority to define what constitutes improper professional conduct and whether it correctly decided that petitioners had engaged in such improper conduct—without the benefit of knowing precisely what the Commission thinks is improper.

## V.

Absent such clarity, the proper course, one that we follow today, is to remand so as to afford the agency an opportunity to set forth its view in a manner that would permit reasoned judicial review. Judge Randolph would go one step further and vacate the order, a position which rests on the following syllogism: An agency that fails to explain adequately its actions necessarily has violated the Administrative Procedure Act and has therefore engaged in unlawful (arbitrary and

capricious) activity. Randolph Op. at 490. All arbitrary and capricious activity must be "set aside"—which means the SEC's order must be "vacated." *Id.* at 491. Therefore, Judge Randolph concludes, an agency's failure to explain its actions adequately enough to provide judicial review must always be vacated. *Id.* at 493. That is so even when the reviewing court is unsure of the agency's reasoning. This assertion, if accepted, would fundamentally alter the role of the judiciary vis-a-vis administrative agencies by forcing courts to decide that the agency's action is either unlawful or lawful on the first pass, even when the judges are unsure as to the answer because they are not confident that they have discerned the agency's full rationale. This assertion finds support in neither logic nor precedent; as far as I can determine, it is an argument that has never been presented by any party in any case—save one, *see infra* at 464–65 n. 13.

Judge Randolph's premise is that the APA requires an agency to explain adequately the basis for every decision, and the failure to do so renders the agency action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). The APA, of course, requires that every agency action include a statement of its "findings and conclusions, and the reasons or basis therefore." 5 U.S.C. § 557(c)(3)(A) (1988). That means that if an agency refused to give *any* reasons for its action a court would have no alternative but to conclude that the agency acted unlawfully. It does not mean, however, that every time a reviewing court wishes further elaboration from an agency, the court perforce has concluded that the agency acted unlawfully.[11] An inadequate statement is, nevertheless, a statement of findings and conclusions, and therefore the agency, by including such a statement, has not necessarily violated Section 557 so as to make its action unlawful under Section 706.

---

11. Judge Randolph's position is logically equivalent to the claim that any time an appellate court remands to a district court for an explanation of a vague opinion, the appellate court has necessarily determined that the lower court has erred—an argument that Judge Randolph presumably would not make. *See United States v. Williams,* 951 F.2d 1287, 1290 (D.C.Cir.1991)

("The purpose of an appeal is to review the judgment of the district court, a function we cannot properly perform if we are left to guess at what it is we are reviewing."); *see also Hotel & Restaurant Employees Union v. Attorney General,* 804 F.2d 1256, 1268 (D.C.Cir.1986); *In re FTC Line of Business Report Litigation,* 626 F.2d 1022, 1029 (D.C.Cir.1980).

Since "courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review," *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) (*Chenery I*), reviewing courts will often and quite properly pause before exercising full judicial review and remand to the agency for a more complete explanation of a troubling aspect of the agency's decision. *See, e.g., Sullivan Indus. v. NLRB*, 957 F.2d 890, 905 n. 12 (D.C.Cir.1992) ("Until the Board explains itself, we have no way of reviewing the Board's actions for consistency or rationality and no way of keeping our own precedents in harmony."); *United States Dep't of Defense v. FLRA*, 982 F.2d 577, 580 (D.C.Cir.1993) ("Because the record and the FLRA's explanation for its decision are insufficient to support judicial review, the case is remanded to FLRA.") (internal quotations and citation omitted); *Radio Station KFH Co. v. FCC*, 247 F.2d 570, 572 (D.C.Cir.1957). The principle has been extended to certain situations where the court is not certain whether an agency has neglected a relevant factor in its decision, *see Southwestern Public Serv. Co. v. FERC*, 952 F.2d 555, 563 (1992); *Charlottesville v. FERC*, 661 F.2d 945, 954 (D.C.Cir. 1981); *City Fed. Savings & Loan Ass'n v. FHLBB*, 600 F.2d 681, 689 (7th Cir.1979); *City Nat'l Bank v. Smith*, 513 F.2d 479 (D.C.Cir.1975), or failed to explain a departure from precedent. *See Philadelphia Gas Works v. FERC*, 989 F.2d 1246, 1247 (D.C.Cir.1993); *Pittsburgh Press Co. v. NLRB*, 977 F.2d 652, 658, 662 (D.C.Cir.1992). In many of these cases, we make clear that in remanding, we have *not* found the agency action to be arbitrary and capricious. *See, e.g., Philadelphia Gas Works v. FERC*, 989 F.2d 1246, 1251 (D.C.Cir.1993); *Sullivan Indus. v. NLRB*, 957 F.2d 890, 905 n. 12 (D.C.Cir.1992).

In *Tex Tin Corp. v. EPA*, 935 F.2d 1321 (D.C.Cir.1991) (*Tex Tin I*), for example, we refused EPA counsel's invitation that we affirm, based on "common sense," the agency's decision to place a hazardous waste facility on the National Priorities List (NPL) under CERCLA:

Common sense cannot answer that question; petitioner is entitled to a decision based on the expertise of the agency. Where the agency has failed to exercise its expertise or to explain the path that it has taken, we have no choice but to remand for a reasoned explanation for the conclusion. . . .

*Id.* at 1324. After the EPA wrote an explanation on remand, the facility again petitioned for review. On the second go-round, *Tex Tin Corp. v. EPA*, 992 F.2d 353 (D.C.Cir.1993) (*Tex Tin II*), Judge Randolph, writing for the court, admonished another panel of the court for having "inaccurately cited *Tex Tin I* as a case involving the vacating of an NPL listing decision," *id.* at 354 n. 1, and thus recognized the distinction between remanding for fuller explanation and deciding agency action to be unlawful. After concluding that the EPA had failed to comply with the remand order, the court then declared the action to be arbitrary and capricious and ordered the facility to be delisted. *See id.* at 356. This is but one of many instances where we have remanded to an agency for a better explanation before finally deciding that the agency's action was arbitrary and capricious. *Compare Bechtel v. FCC*, 10 F.3d 875, 887 (D.C.Cir.1993) *with Bechtel v. FCC*, 957 F.2d 873, 882 (D.C.Cir.), *cert. denied sub nom. Galaxy Communications Inc. v. FCC*, —— U.S. ——, 113 S.Ct. 57, 121 L.Ed.2d 26 (1992); *United States Office of Personnel Management v. FLRA*, 905 F.2d 430, 434 (D.C.Cir.1990) *with American Fed'n of Gov't Employees v. FLRA*, 853 F.2d 986, 993 (D.C.Cir.1988); *Greyhound Corp. v. ICC*, 668 F.2d 1354, 1364 (D.C.Cir. 1981) *with Greyhound Corp. v. ICC*, 551 F.2d 414, 418 (D.C.Cir.1977).

To be sure, there are cases where an agency's failure to state its reasoning or to adopt an intelligible decisional standard is so glaring that we can declare with confidence that the agency action was arbitrary and capricious. *See, e.g., Airmark Corp. v. FAA*, 758 F.2d 685, 695 (D.C.Cir.1985) ("[T]he FAA has utterly failed to provide a consistent approach that would allow even a guess as to what the decisional criteria would be."). And an agency's failure to distinguish applicable precedents or to explain its decision could be violative of the APA. *American Fed'n of*

*Gov't Employees v. FLRA,* 774 F.2d 498, 504–05 (D.C.Cir.1985).

In practice, the distinction—between a case where the reviewing court determines that the agency's explanation for its action is so crippled as to be unlawful and one where the court, unsure of the agency's reasoning, remands for a fuller explanation without expressing a view as to whether the agency's action is unlawful—is a matter of degree. But doctrinally the difference is enormous; in the latter course, which I think describes this case and which we follow today, the court has withheld full judicial review and therefore has not yet determined whether the agency action is arbitrary and capricious. The Supreme Court itself has recognized that a reviewing court may proceed cautiously by remanding for fuller explanation before deciding whether the agency's action violated administrative law:

> Where the statement inadequately discloses his reasons, the Secretary may be afforded opportunity to supplement his statement. . . . The district court may, however, ultimately come to the conclusion that the Secretary's statement of reasons on its face renders necessary the conclusion that his decision not to sue is so irrational as to constitute the decision arbitrary and capricious.

*Dunlop v. Bachowski,* 421 U.S. 560, 574–75, 95 S.Ct. 1851, 1861–62, 44 L.Ed.2d 377 (1975) (citations omitted) *overruled in not relevant part by Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley,* 467 U.S. 526, 549–50 n. 22, 104 S.Ct. 2557, 2570, n. 22, 81 L.Ed.2d 457 (1984).

*Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), on which Judge Ran-

dolph relies, does not hold otherwise; it actually lends further support to the foregoing analysis. The Court there reconciled the ostensible conflict between *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), which prohibited courts from imposing procedural requirements other than those found in the APA, and *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), which held that an agency's *post hoc* rationalization does not provide an adequate basis for judicial review under the APA, by stating:

> At most, *Overton Park* suggests that § 706(2)(A), which directs a court to ensure that an agency action is not arbitrary and capricious or otherwise contrary to law, imposes a general "procedural" requirement of sorts by mandating that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision.

*Pension Benefit,* 496 U.S. at 654, 110 S.Ct. at 2680. This statement does not, as Judge Randolph implies, mean that the agency's failure to provide a satisfactory explanation is *per se* arbitrary and capricious, but that in order for the court to fulfill its duties under section 706, the agency must explain adequately its actions. Until the agency does so, the court cannot determine whether the action is arbitrary and capricious, and, indeed, for the court to so declare before it can discern the agency's rationale is a violation of *Vermont Yankee. See Pension Benefit,* 496 U.S. at 655, 110 S.Ct. at 2680.[12]

Judge Randolph would distinguish cases where we have remanded for further explanation without vacating the agency action [13]

---

**12.** Similarly, Judge Randolph's truncated description of *Nassar & Co., Inc. v. SEC,* 566 F.2d 790 (D.C.Cir.1977), misstates the case. There we vacated the Commission's order because of an intervening Supreme Court decision, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), which cast doubt on the legal basis for the Commission's conclusion that petitioner violated the statute. We never even reached the question whether the sanction imposed—to which the language Judge

Randolph quotes is directed—was appropriate. *See Nassar,* 566 F.2d at 794.

**13.** Appended to this opinion is a non-exhaustive list of these cases, 29 in this circuit alone between 1991 and 1993. Judge Randolph mischaracterizes the cases as ordering "a remand only despite finding agency action arbitrary and capricious." The appended cases, of course, do not so hold: They are occasions where, as here, we remanded because we cannot determine whether the agency has acted arbitrarily and

on grounds that they did not specifically address the mandate of section 706(2)(A) and therefore are "inconsequential for precedential purposes." But the cases do not cite or discuss section 706(2)(A) because we had not found the agency action to be arbitrary and capricious; we were simply unsure and therefore asked the agency for clarification of its position and the rationale therefor. *See, e.g., Philadelphia Gas Works v. FERC,* 989 F.2d 1246, 1251 (D.C.Cir.1993). Instead of providing a basis for distinction, Judge Randolph's analysis is circular; it assumes the validity of the premise for his position.

As I have shown, that premise is flawed, and therefore Judge Randolph's syllogism is *a fortiori* invalid. But it is worth noting that Judge Randolph's minor proposition—that all agency actions determined to be arbitrary and capricious must be set aside—is also dubious, in light of circuit precedent. Even after condemning an agency action as arbitrary and capricious, we have recognized our remedial discretion not to vacate the agency decision:

> In fashioning a remedy for an agency's failure to present an adequate statement of basis and purpose, this court may either remand for specific procedures to cure the deficiency without vacating rule, *see, e.g., National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 701, 703–04 (2d Cir.), *cert. denied,* 423 U.S. 827 [96 S.Ct. 44, 46 L.Ed.2d 44] (1975), or it may vacate the rule, thus requiring the agency to initiate another rulemaking proceeding if it would seek to confront the problem anew. *See, e.g., Tabor v. Joint Bd. for Enrollment of Actuaries,* 566 F.2d 705, 710–12 (D.C.Cir.1977).

*Independent U.S. Tanker Owners Comm. v. Dole,* 809 F.2d 847, 854–55 (D.C.Cir.), *cert. denied sub nom. Atlantic Richfield Co. v. Independent U.S. Tanker Owners Comm.,* 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39

(1987). This language, which Judge Randolph dismisses as a case that had "gone astray", was quoted approvingly in *United Mine Workers, Int'l Union v. Dole,* 870 F.2d 662, 673 (D.C.Cir.1989). *See also Brookings Mun. Tel. Co. v. FCC,* 822 F.2d 1153, 1171–72 (D.C.Cir.1987). Tellingly, the bulk of Judge Randolph's discussion (and virtually all of the cases on which he relies) is directed to this minor proposition which I need not even reach because, as I have noted, I think his premise—that whenever an agency provides a reviewing court with an inadequate explanation of its decision, the agency necessarily has acted unlawfully—is quite wrong.

As a practical matter, vacating the order in this case would stay petitioners' suspension until the Commission reissues an improved opinion. Judge Randolph suggests that if the Commission wishes to leave the suspensions in place pending remand, it should apply for a stay of this court's mandate. Petitioners, however, had the opportunity to request a stay of their suspension pending appeal (and therefore pending our remand order) by application either to the Commission or to this court for a stay. *See* 15 U.S.C. § 78y(c)(2). Since petitioners made no such application and, in any event, "there was no reasonable ground for failure to apply to the Commission," *id.,* I see no reason for us to even consider providing the relief that they did not seek.

\*    \*    \*    \*    \*    \*

This is doubtless an important case regarding the SEC's authority to regulate the conduct of professionals practicing before the Commission. (In my view it also implicates substantial issues of judicial review of administrative agencies—largely because of Judge Randolph's challenge to long-standing practices of our court.) I think the Commission should state clearly and without equivocation its decisional standard with respect to "improper professional conduct" under Rule

---

capriciously. For whatever it is worth, Judge Randolph joined several of these decisions and in one disposition, *Latham v. NTSB,* 6 F.3d 829 (D.C.Cir. 1993), denied a petition for rehearing which specifically argued that the Board's failure to articulate reasons for its action required that the order not be remanded but set aside as arbitrary and capricious

under 5 U.S.C. § 706(2)(A). *See Latham v. NTSB,* No. 92–1187 (D.C.Cir. Nov. 17, 1993). In *Railway Labor Executives' Ass'n v. United States,* 987 F.2d 806 (D.C.Cir.1993), Judge Randolph joined a *per curiam* opinion which remanded an ICC order for further explanation, stating: "We do not, however, vacate the October 4, 1990 order." *Id.* at 821.

2(e)(1)(ii) and how petitioners' conduct violates that standard. Doing so, of course, would force the Commission to face squarely and forthrightly the legal and practical consequences of its decision. The Commission's task on remand, and the considerations it must address, I think are readily discernible from a careful reading of my and Judge Randolph's opinions, as well as Judge Reynolds' dissent.

## APPENDIX

### D.C. Circuit cases remanding for inadequate explanation without vacating the agency action.

#### 1991–1993

1. *Western Resources, Inc. v. FERC,* 9 F.3d 1568, 1580 (D.C.Cir.1993).

2. *Timpinaro v. SEC,* 2 F.3d 453, 460 (D.C.Cir.1993).

3. *Edison Elec. Inst. v. EPA,* 2 F.3d 438, 447 (D.C.Cir.1993).

4. *Laclede Gas Co. v. FERC,* 997 F.2d 936, 948 (D.C.Cir.1993).

5. *Mesa v. FERC,* 993 F.2d 888, 898 (D.C.Cir.1993).

6. *Philadelphia Gas Works v. FERC,* 989 F.2d 1246, 1250–57 (D.C.Cir.1993).

7. *Ethyl Corp. v. Browner,* 989 F.2d 522, 524 (D.C.Cir.1993).

8. *Somerset Welding & Steel, Inc. v. NLRB,* 987 F.2d 777, 782 (D.C.Cir.1993).

9. *U.S. Dept. of Defense v. FLRA,* 982 F.2d 577, 580 (D.C.Cir.1993).

10. *Pittsburgh Press Co. v. NLRB,* 977 F.2d 652, 662 (D.C.Cir.1992).

11. *New York v. Reilly,* 969 F.2d 1147, 1153 (D.C.Cir.1992).

12. *Pension Benefit Guaranty Corp. v. FLRA,* 967 F.2d 658, 668–69 (D.C.Cir. 1992).

13. *Leeco, Inc. v. Hays,* 965 F.2d 1081, 1085 (D.C.Cir.1992).

14. *NLRB v. McClatchy Newspapers, Inc.,* 964 F.2d 1153, 1154 (D.C.Cir.1992).

15. *George Hyman Constr. Co. v. Brooks,* 963 F.2d 1532, 1540–41 (D.C.Cir.1992).

16. *United States Information Agency v. FLRA,* 960 F.2d 165, 171 (D.C.Cir.1992).

17. *Sullivan Indus. v. NLRB,* 957 F.2d 890, 905 (D.C.Cir.1992).

18. *Williams Enter., Inc. v. NLRB,* 956 F.2d 1226, 1240 (D.C.Cir.1992).

19. *City of Holyoke Gas & Elec. Dep't v. FERC,* 954 F.2d 740, 743 (D.C.Cir.1992).

20. *Southwestern Pub. Serv. Co. v. FERC,* 952 F.2d 555, 563 (D.C.Cir.1992).

21. *District Lodge 64, International Ass'n of Machinists and Aerospace Workers v. NLRB,* 949 F.2d 441, 450 (D.C.Cir.1991).

22. *Southwest Merchandising Corp. v. NLRB,* 943 F.2d 1354, 1361 (D.C.Cir. 1991).

23. *Oklahoma Natural Gas Co. v. FERC,* 940 F.2d 699, 704 (D.C.Cir.1991).

24. *Consumers Union of the U.S., Inc. v. Federal Reserve Bd.,* 938 F.2d 266, 274 (D.C.Cir.1991).

25. *Tex Tin Corp. v. EPA,* 935 F.2d 1321, 1324 (D.C.Cir.1991).

26. *Alliance for Cannabis Therapeutics v. DEA,* 930 F.2d 936, 940–41 (D.C.Cir. 1991).

27. *Tennessee Gas Pipeline Co. v. FERC,* 926 F.2d 1206, 1213 (D.C.Cir.1991).

28. *Bangor Hydro–Electric Co. v. FERC,* 925 F.2d 465, 468 (D.C.Cir.1991).

29. *International Union, United Mine Workers of Am. v. Federal Mine Safety and Health Admin.,* 924 F.2d 340, 346 (D.C.Cir.1991).

RANDOLPH, Circuit Judge:

David J. Checkosky and Norman A. Aldrich, both of whom are certified public accountants, petition for judicial review of the Securities and Exchange Commission's order suspending them from practicing before the Commission for two years. The case is complex. The record consists of nearly 4,000 transcript pages and hundreds of exhibits relating to five audits petitioners conducted and the governing accounting principles and standards. Petitioners raise serious issues concerning, among other subjects, the sufficiency of the evidence, the Commission's interpretation of accounting principles, the Commission's authority to regulate their con-

duct, and the standard of care by which the Commission judged their conduct.

Also before the court is the district court's judgment—which we affirm for the reasons given in Part V of this opinion—refusing to grant Checkosky and Aldrich leave to depose members of the Commission and others pursuant to Rule 27 of the Federal Rules of Civil Procedure. Checkosky and Aldrich sought the same relief when they attempted—unsuccessfully, we decide—to file a mandamus petition in this court. We also sustain the Commission's rejection of petitioners' motion for discovery regarding alleged procedural irregularities in the Commission's handling of their case.

The Commission issued its order suspending Checkosky and Aldrich pursuant to Rule 2(e)(1)(ii) of its Rules of Practice, 17 C.F.R. § 201.2(e)(1)(ii), after finding that they had not followed generally accepted auditing standards in examining and certifying financial statements filed with the agency.

I conclude that the Commission had authority to promulgate Rule 2(e). Judge Silberman comments that my analysis "seems to conflate" the Commission's enforcement authority with its authority to discipline professionals. Silberman op. at 456 n. 3. The reader will learn otherwise in Part II of this opinion. My point is that the Commission's authority under Rule 2(e) must rest on and be derived from the statutes it administers.

As Judge Reynolds and I agree, the Commission held that it may sanction auditors for negligent conduct under Rule 2(e)(1)(ii). All of us agree that substantial evidence supported the Commission's findings. I do not believe, however, that the Commission adequately explained why the legal principles it announced earlier in a Rule 2(e) prosecution of attorneys should not preclude it from suspending auditors for negligent conduct. Because the Commission acted arbitrarily and capriciously, the law requires the court to vacate the Commission's order suspending Checkosky and Aldrich for two years, beginning August 1992. I therefore dissent from the judgment, which merely remands the case, a result representing our least common denominator. Remanding without vacating, as Judge Silberman advocates, not only violates the Administrative Procedure Act but also forces petitioners to serve out their suspensions while the Commission ponders its unlawful order.

The balance of this opinion is organized as follows:

PAGE
I. INTRODUCTION ........................................................... 467
II. THE COMMISSION'S AUTHORITY TO PRESCRIBE RULE 2(e) ...................... 468
III. THE SUFFICIENCY OF THE EVIDENCE ..................................... 472
    A. GAAP AND GAAS ................................................... 472
    B. THE SAVIN AUDITS .............................................. 473
    C. THE EVIDENCE REGARDING FAS 2 ................................... 475
    D. THE EVIDENCE REGARDING GAAS VIOLATIONS ......................... 478
IV. SCIENTER AND RULE 2(e)(1)(ii) ....................................... 479
    A. THE COMMISSION HELD THAT A NEGLIGENCE STANDARD APPLIES TO
        VIOLATIONS OF RULE 2(e)(1)(ii) ................................. 480
    B. THE COMMISSION IMPROPERLY ADDED A CHARGE OF RECKLESS CONDUCT.... 481
    C. THE COMMISSION IMPROPERLY RELIED ON AN UNPUBLISHED DECISION .... 482
    D. THE COMMISSION FAILED TO DISTINGUISH *CARTER* ................. 483
V. DISCOVERY INTO THE COMMISSION'S DELIBERATIONS ........................ 487
VI. REMANDING WITHOUT VACATING VIOLATES THE ADMINISTRATIVE PROCEDURE ACT.... 490

I

INTRODUCTION

Coopers & Lybrand, a national accounting firm, served as the independent auditor for Savin Corporation, a Delaware corporation with headquarters in Connecticut. Savin registered its securities under section 12(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l* (b), and filed periodic reports

with the Commission, including its audited financial statements. *See* 15 U.S.C. § 78m(a); 17 C.F.R. § 249.310 (form 10–K); *see generally* SEC Reg. S–X, 17 C.F.R. pt. 210 (containing the requirements for the financial statements). Savin's stock was traded on the New York Stock Exchange and the Pacific Stock Exchange.

Checkosky and Aldrich worked in Coopers & Lybrand's Stamford, Connecticut office. They were, respectively, the engagement partner and audit manager on the audits of Savin's financial statements for the fiscal years (May 1 to April 30) 1981 through 1984. After Aldrich became a partner in the fall of 1984, he served as a second, or concurring, partner on the Savin 1984 calendar year audit (eight months ended December 31, 1984). On behalf of Coopers & Lybrand, Checkosky and Aldrich issued the accountant's reports, stating that their examinations were made in accordance with generally accepted auditing standards (GAAS), and that Savin's financial statements fairly presented the required information in conformity with generally accepted accounting principles (GAAP). For each of the years in question, Savin filed its financial statements and the accountants' reports with the Commission.

When Checkosky and Aldrich certified Savin's financial statements, they were "practicing before" the Commission. "Practice" includes "the preparation of any statement, opinion or other paper by any attorney, accountant, engineer or other expert, filed with the Commission" in any report. 17 C.F.R. § 201.2(g)(2). In 1987, the Commission, at the urging of its Office of Chief Accountant, initiated a private proceeding to determine whether Checkosky and Aldrich had engaged in "improper professional conduct," in violation of Rule 2(e)(1)(ii) in connection with Savin's financial statements for the five accounting periods. Rule 2(e)(1), 17 C.F.R. § 201.2(e)(1), reads:

> The Commission may deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any

person who is found by the Commission after notice of and opportunity for hearing in the matter (i) not to possess the requisite qualifications to represent others, or (ii) to be lacking in character or integrity or to have engaged in unethical or improper professional conduct, or (iii) to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws (15 U.S.C. 77a to 80b–20), or the rules and regulations thereunder.[1]

## II

### THE COMMISSION'S AUTHORITY TO PRESCRIBE RULE 2(e)

Before giving further details about the case against Checkosky and Aldrich, I will address their claim that Rule 2(e) is invalid.

Most of Rule 2(e), including the portion used against these petitioners (the second clause of Rule 2(e)(1)(ii)), has been in effect for more than half a century. Two courts of appeals have passed on the rule's validity, both in cases involving disciplinary actions against auditors. *Touche Ross & Co. v. SEC*, 609 F.2d 570, 577–82 (2d Cir.1979), generally sustained the rule, as did *Davy v. SEC*, 792 F.2d 1418, 1421–22 (9th Cir.1986), which relied on *Touche*, although in *Davy* the court reserved decision on what standards of care the Commission validly could impose on accountants. 792 F.2d at 1422.

Neither the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78ll, nor the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, expressly authorizes the Commission to discipline accountants who "practice" before the agency. The only analogous authority, contained in the 1934 Act, relates to securities brokers and dealers who are subject to suspension or revocation if the Commission finds that they have been convicted of certain crimes or that they have "willfully" committed specified securities violations. *See* 15 U.S.C. §§ 78o (b)(4), 78o–3(h), 78o–4(c), 78o–

---

1. In addition, attorneys who have been disbarred or suspended in any state; accountants, engineers and other experts whose license has been revoked or suspended; and any person who has been convicted of a felony or a misdemeanor involving moral turpitude "shall be forthwith suspended from appearing or practicing before the Commission." Rule 2(e)(2), 17 C.F.R. § 201.2(e)(2); *see also* 17 C.F.R. § 210.2–01.

5(c); *see also Steadman v. SEC,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981), regarding disciplinary proceedings under other statutes the Commission administers. Given this void, the Commission locates its authority for Rule 2(e) in its general rulemaking power pursuant to section 23(a)(1) of the 1934 Act (15 U.S.C. § 78w(a)(1)), and pursuant to a nearly identical section in the 1933 Act (15 U.S.C. § 77s(a)). Section 23(a)(1) states:

> The Commission ... shall ... have power to make such rules and regulations as may be necessary or appropriate to implement the provisions [of the 1934 Act] for which [it is] responsible or for the execution of the functions vested in [it] by this chapter....

"Necessary or appropriate," like "necessary and proper," is potentially open-ended language, as Chief Justice Marshall demonstrated in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). But no one would suppose that the Commission's rulemaking power is the power to prescribe whatever the agency sees fit. There are limits, derived from the substantive provisions of the statute. Section 10(b) of the 1934 Act, for instance, contains similar rulemaking language: it makes it "unlawful for any person ... (b) [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as *necessary or appropriate* in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (italics added). *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 215, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976), held that because section 10(b) liability is framed in terms of intentional misconduct, a Commission rule could not predicate recovery on negligence, even though dispensing with scienter might advance the statutory objective of protecting investors. "The rulemaking power granted to an administrative agency," the Court added, "is not the power to make law." 425 U.S. at 213, 96 S.Ct. at

1391. It is instead "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Manhattan Gen. Equip. Co. v. Comm'r,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936).

The case before us differs from *Ernst & Ernst* in the respect that Rule 2(e) does not alter any statutory basis for suspending accountants from practicing before the Commission; there is none. That difference, petitioners say, cuts in their favor. Put in terms of the Commission's rulemaking statute, their point is that a Commission regulation cannot be viewed as "necessary or appropriate" to implement a statutory provision when there is no provision to implement.

As against this the Commission invokes *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973), a decision sustaining a Federal Reserve Board rule on the ground that it was "'reasonably related to the purposes of the enabling legislation.'" *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969). The Federal Reserve Board derived its power from a statute authorizing rules "necessary or proper to effectuate the *purposes*" of the legislation. The Commission's rulemaking authority is worded differently. It extends only to regulations implementing statutory *"provisions,"* which might be considered more confining. *See Rodriguez v. United States,* 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (per curiam). A distinction along these lines would lend support to petitioners, but we are not free to draw it. Like section 23(a)(1) of the 1934 Act, the rulemaking section in *Thorpe,* 393 U.S. at 280–81, 89 S.Ct. at 525–26 also authorized rules and regulations necessary to carry out statutory "provisions," rather than purposes. Yet *Mourning* treated the two formulations as equivalent (411 U.S. at 369–70, 93 S.Ct. at 1660–61), and construed both to permit agencies to prescribe remedial measures "reasonably related" to statutory purposes.[2] *See also Ameri-*

---

**2.** Decisions of this court do the same. *See, e.g., State of Ohio v. Department of Interior,* 880 F.2d 432, 473–74 (D.C.Cir.1989); *Community for*

*Creative Non–Violence v. Kerrigan,* 865 F.2d 382, 385 (D.C.Cir.1989); *Action on Smoking & Health v. CAB,* 699 F.2d 1209, 1212 (D.C.Cir.1983);

*can Trucking Ass'ns v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953), which the Court cited in conjunction with *Thorpe*.

I therefore agree with the Commission, and with the Second Circuit in *Touche*, 609 F.2d at 579, that we are bound to apply *Mourning's* test and thus must examine Rule 2(e)'s relationship to "the purposes of the enabling legislation." Protecting those who rely on financial statements filed with the Commission and promoting accuracy in reporting are doubtless objectives of both the 1933 and 1934 Acts. *See Touche*, 609 F.2d at 580–81. But to ask simply whether Rule 2(e) is reasonably related to such sweeping objectives is to put the matter too generally. "[T]he purpose of a statute," the Supreme Court has reminded us, "includes not only what it sets out to change, but also what it resolves to leave alone." *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991).

In this regard, petitioners say that one subject Congress decided to leave alone was disciplinary actions against members of the accounting profession. Brief for Petitioners at 25, citing, *inter alia*, Robert A. Downing & Richard L. Miller, Jr., *The Distortion and Misuse of Rule 2(e)*, 54 NOTRE DAME LAW. 774, 777 & n. 19 (1979). Petitioners are incorrect for two reasons. One, the authority invoked to support their proposition—a colloquy between a Commerce Department attorney and a Senator during hearings on what became the 1933 Act[3]—by no means represents a decision of Congress. So far as appears, Congress never voted on giving the Commission disciplinary power over accountants. Two, the Senator's question and the attorney's answer dealt only with the Com-

mission's having admission requirements for accountants. The issue here is whether the Commission may validly prescribe a disciplinary rule for accountants already practicing before the agency, not a licensing scheme controlling admission. *See Polydoroff v. ICC*, 773 F.2d 372, 374 (D.C.Cir.1985), making the same distinction in a related context.

Among the subjects Congress did resolve to regulate were financial reporting and the role of accountants in ensuring the accuracy of financial statements. Under the 1934 Act, issuers of registered securities must keep books and records "accurately and fairly" reflecting transactions and dispositions of assets. 15 U.S.C. § 78m(b)(2). They must also maintain a system of "internal accounting controls" in order to allow preparation of financial statements "in conformity with generally accepted accounting principles or any other criteria applicable to such statements." *Id.* The 1934 Act gave the Commission authority to define accounting terms (15 U.S.C. § 78c(b)); to require balance sheets, profit and loss statements, and other financial statements included in annual reports and in registration statements to be "certified ... by independent public accountants" (15 U.S.C. §§ 78*l*(b) & (g), 78m(a)); and to prescribe the form in which such financial statements are to be filed with the Commission, the items to be shown on the balance sheets and the earnings statements, and "the methods to be followed" in their preparation (15 U.S.C. § 78m(b)(1)). Over the years, the Commission has issued an extensive array of regulations covering these subjects. For example, because financial statements must be certified by independent public accountants, the Commission's rules: (1) specify that

---

*Global Van Lines, Inc. v. ICC*, 627 F.2d 546, 551 (D.C.Cir.1980), *cert. denied*, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981).

**3.** *Securities Act: Hearings on S. 875 before the Senate Comm. on Banking and Currency*, 73d Cong., 1st Sess. 248 (1933):

Senator Couzens.... Would it not be practicable to have a system set up whereby the Federal Trade Commission could approve of practitioners or public accountants or appraisers before they accepted their statements?

Mr. Butler. It might be practicable, and in the study of this draft it was discussed. The

reason why such a provision was not included was the feeling that this would put a discretion in the hands of the Commission that might be dangerous and that certainly would be criticized.

(Congress had empowered the Federal Trade Commission to supervise the securities laws until the SEC could be organized. Phillip H. Levy, Note, *Regulation of the Accounting Profession Through Rule 2(e) of the SEC's Rules of Practice: Valid or Invalid Exercise of Power?*, 46 BROOK. L.REV. 1159, 1177–78 n. 97 (1980).)

"public" accountants are only those duly registered and in good standing in the jurisdiction in which they are located, SEC Reg. S–X, 17 C.F.R. § 210.2–01; (2) set forth the indicia of independence, *id.;* and (3) define the statutory term "certified," *id.* § 210.1–02(f). The "accountant's report" or opinion, which is needed for certification, must "state whether the audit was made in accordance with generally accepted auditing standards." *Id.* § 210.2–02(b). One such auditing standard is that the auditor must give an opinion stating "whether the financial statements are presented in accordance with generally accepted accounting principles." CODIFICATION OF STATEMENTS ON AUDITING STANDARDS, AU § 150.02 (Am.Inst. of Certified Pub.Accountants 1993) (Standard of Reporting 1) (hereinafter "AUDITING STANDARDS").

In view of these provisions, and the Commission's interpretations of them, the argument that, with respect to accountants, Rule 2(e) is unrelated to what the 1934 Act regulates proves too much. Suspending or barring accountants who, for example, deliberately violate the securities laws surely implements at least some of the provisions just recited. The same may be said of Rule 2(e) sanctions imposed on an auditor who certified financial statements despite realizing his lack of independence from the reporting company, or who knowingly assisted in the filing of materially false statements with the Commission. Such individuals cannot be trusted and neither can their reports. While it may be that their own state society or state board of accountancy could take action against them,[4] there is no reason why the Commission should have to depend on that happening. All of these considerations take on more force because Rule 2(e), added in the Commission's early days, reflects the agency's contemporary interpretation of the extent of its rulemaking power. *Public Citizen v. Department of Justice*, 491 U.S. 440, 464 n. 12, 109 S.Ct. 2558, 2572 n. 12, 105 L.Ed.2d 377 (1989); *Steadman v. SEC*, 450 U.S. at 103–04, 101 S.Ct. at 1009; *United States v. National Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 718–19, 95 S.Ct. 2427, 2442–43, 45 L.Ed.2d 486 (1975); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). In regard to the accounting profession, then, petitioners' facial attack on Rule 2(e) fails.[5]

The particular portion of the rule at issue here—the second clause of Rule 2(e)(1)(ii)—allows the Commission to suspend practitioners found "to have engaged in … improper professional conduct." Whether the Commission validly promulgated this portion of the rule necessarily depends on what "improper" means. The term is not defined in the regulations. The Commission's opinion in this case did not supply any all-encompassing definition of "improper," but it did express agreement with the Administrative Law Judge that an accountant's failure to conform to GAAS could serve as a predicate for finding a violation of Rule 2(e)(1)(ii). Putting aside the question whether the Commission also must find scienter before it may suspend an accountant, a question discussed in Part IV of this opinion, I believe this portion of the rule is within the Commission's authority. To the extent that "improper" comprehends transgressions of GAAS, Rule 2(e)(1)(ii) is reasonably related to the 1934 Act. The provisions of the statute, together with the Commission's rules thereunder, require auditors issuing opinions on financial statements to comply with GAAS, and thus to determine if the audited statements adhere to GAAP. ·Compliance with these requirements gives credibility to financial statements. It promotes the use of financial statements as the 1934 Act intended them to be used: to assess the financial health of a company; to compare one company's performance with another's; and to evaluate any single company's progress over several ac-

---

**4.** Members of the American Institute of Certified Public Accountants also must adhere to its Code of Professional Conduct, which provides:
> In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others.

CODE OF PROFESSIONAL CONDUCT, Rule 102 (Am.Inst. of Certified Pub.Accountants 1988) (hereinafter "CODE OF PROFESSIONAL CONDUCT").

**5.** I express no opinion regarding Rule 2(e)'s validity with respect to attorneys and other professionals who practice before the Commission.

counting periods. A rule providing sanctions against accountants who have, for example, intentionally disregarded GAAS tends to increase the likelihood of future compliance, or so the Commission was entitled to believe. I therefore conclude that, as applied to auditors, Rule 2(e)(1)(ii) was within the Commission's rulemaking power under section 23(a)(1) of the 1934 Act.

### III

### THE SUFFICIENCY OF THE EVIDENCE

The next question is whether there is substantial evidence to sustain the Commission's conclusions that Checkosky and Aldrich misinterpreted GAAP and failed to conduct their audits in conformity to GAAS. For the moment I will assume the Commission may suspend auditors for engaging in "improper conduct" under Rule 2(e)(1)(ii) when they have acted negligently, an issue addressed in Part IV.

### A

### GAAP AND GAAS

In the private proceeding, the Commission's Chief Accountant alleged that contrary to GAAP, Savin's financial statements treated millions of dollars of research and development costs as deferred "start-up costs" on photocopier projects; that because these costs should have been "expensed," Savin's financial statements materially overstated its assets and net worth, and materially understated its losses; that Checkosky and Aldrich had not complied with GAAS in conducting their audits; and that they should have qualified their opinions on the basis that Savin's financial statements did not conform to GAAP and were materially misstated.[6]

When Checkosky and Aldrich examined Savin's books, their main objective was the same as that in any financial audit: to determine whether their client Savin had adhered to generally accepted accounting principles,

or GAAP, in preparing its financial statements. Auditors follow generally accepted auditing standards, or GAAS, classified under ten standards adopted by the American Institute of Certified Public Accountants, describing the independent auditor's professional duties. AUDITING STANDARDS, AU § 150.02. Although auditors may make suggestions about financial statements, or even draft them, financial statements remain "management's responsibility. The auditor's responsibility is to express an opinion on the financial statements." *Id.* § 110.02. In forming his opinion, the auditor must be impartial and independent of the client. *Id.* § 220.01–02. *See Edenfield v. Fane,* —— U.S. ——, ——, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993); *United States v. Arthur Young & Co.,* 465 U.S. 805, 818, 104 S.Ct. 1495, 1503, 79 L.Ed.2d 826 (1984). Auditors must test their client's transactions by obtaining "sufficient competent evidential matter" to confirm whether these have been fairly presented in the financial statements. AUDITING STANDARDS, AU § 326.01. When the audit is finished, GAAS (AUDITING STANDARDS, AU § 150.02) and the Commission's rules (17 C.F.R. § 210.2–02(b)) require the auditor to give an opinion about whether the audited financial statements fairly present the required information in conformity with GAAP.

Generally accepted accounting principles are the "accounting conventions by which financial information is recorded, attributed to particular periods and summarily presented in the form of financial statements." James F. Strother, *The Establishment of Generally Accepted Accounting Principles and Generally Accepted Auditing Standards,* 28 VAND.L.REV. 201, 203 (1975); *see* Accounting Practices Board Statement No. 4, *Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises* ¶ 138 (1970). A private professional organization, the Financial Accounting Standards Board, or FASB, is considered authori-

---

**6.** In 1985, Savin entered into a consent decree restraining it from violating §§ 13(a) and 13(b)(2) of the Securities Exchange Act and Commission Rules 13a–1 and 13a–13. 15 U.S.C.

§§ 78m(a) & 78m(b)(2); 17 C.F.R. §§ 240.13a–1 & 240.13a–13. Savin agreed to restate its financial statements for the accounting periods at issue here.

tative with respect to GAAP.[7] The FASB issues pronouncements in the form of Statements and Interpretations, often setting forth not only the basis for its conclusions about accounting issues, but also its reasons for rejecting other options. The Commission treats the "principles, standards and practices promulgated by the FASB ... as having substantial authoritative support" and views those contrary to the FASB's pronouncements as having "no such support." Statement of Policy on Establishment and Improvement of Accounting Principles and Standards, Accounting Series Release No. 150, 39 Fed.Reg. 1260, 1260 (1974).

The case against Checkosky and Aldrich focused on one such FASB Statement—No. 2—which deals with the proper accounting treatment of research and development costs.[8] The problem presented by R & D costs is a common one. As Strother has so effectively put it, the difficulty stems from the fact that financial statements are, by "need, custom, tradition, or law," presented not when an enterprise has ended, but on an interim basis, typically annually. Strother, *supra*, 28 VAND.L.REV. at 202. "If an income figure for a period is to be derived, the revenues and expenses attributable to the period must be determined, notwithstanding the fact that their receipt and expenditure may be periods apart." *Id.* On the one hand, investments in a research and development program, if expensed when incurred, could convey to readers of the company's financial statements the impression of an adverse earnings trend when, in fact, the ostensible trend should be disregarded as insignificant. On the other hand, if companies freely capitalized R & D costs, thus spreading and deferring the adverse impact on earnings to future periods, this could convey a rosy profit picture and yet nothing might come of the

investment, which eventually would have to be written off. *Id.* at 204.

Faced with the choice, the FASB decided in its Statement No. 2, effective January 1, 1975, that "All research and development costs encompassed by this Statement shall be charged to expense when incurred." FAS 2 ¶ 12. It reached this decision partly because, throughout American industry, the failure rate of research and development projects is high. The FASB cited a study of a number of industries showing that "an average of less than 2 percent of new product ideas and less than 15 percent of product development projects were commercially successful." FAS 2 ¶ 39. There was thus no demonstrable "direct relationship between research and development costs and specific future revenue generally ..., even with the benefit of hindsight." FAS 2 ¶ 41.

## B

### THE SAVIN AUDITS

The evidence in the Rule 2(e) proceeding revolved around Savin's effort to enter the business of manufacturing photocopier machines and the company's treatment of costs incurred in that effort. The company had for years marketed photocopiers and other office equipment. In 1975, Savin became the exclusive distributor of photocopier machines produced by Ricoh Company, Ltd. These machines, unlike those of competitors such as Xerox, used a liquid toner technology and were relatively inexpensive. By the late 1970's, Savin was doing approximately $450 million worth of business, placing 400,000 to 500,000 Ricoh machines in service throughout the United States and Canada.

Anticipating that Ricoh Company might not renew its exclusive marketing agreement,

---

7. However, generally accepted accounting principles are "not limited to the principles in pronouncements of authoritative bodies such as [FASB]. They also include practices that have achieved acceptance through common usage as well as principles in nonauthoritative pronouncements of bodies of recognized stature...." THE COMMISSION ON AUDITORS' RESPONSIBILITIES, REPORT OF TENTATIVE CONCLUSIONS 15 (1977).

AUDITING STANDARDS, AU § 411, *The Meaning of Present Fairly in Conformity with Generally Ac-*

*cepted Accounting Principles in the Independent Auditor's Report* (effective for audits of financial statements for periods ending after March 15, 1992), also suggests other possible sources of GAAP, including pronouncements of regulatory agencies and accounting textbooks and articles.

8. ACCOUNTING FOR RESEARCH AND DEVELOPMENT COSTS, Statement of Financial Accounting Standards No. 2 (Fin.Accounting Standards Bd.1974) (hereinafter "FAS 2").

Savin embarked on "Project X," a long-term undertaking to develop, manufacture and sell its own line of high speed, liquid toner photocopiers. In 1977, Savin retained Benzion Landa, an inventor, to design a new photocopier. Two years later, it purchased a manufacturer of computer parts to produce parts for its anticipated line of photocopiers; established an Engineering and Manufacturing Division, ultimately employing 400 to 500 engineers and other workers; and began construction on a manufacturing facility to assemble its machines.

In early spring 1980, Landa delivered to Savin what one observer described as a photocopier model, sophisticated in design although not at a stage where it could produce copies. With the design drawings in hand, Savin instructed its Engineering and Manufacturing Division to develop a line of photocopiers using the Landa model as a starting point. That fall, Savin notified Checkosky that it had a successful working model of the photocopier and that it wanted to begin capitalizing costs associated with the start-up of manufacturing. Checkosky consulted FAS 2 and a lengthy treatise (MONTGOMERY'S AUDITING) on the practice of auditing, which discussed accounting principles to a limited extent.[9] Concluding that the project had passed out of research and development and into manufacturing start-up, and that Savin's capitalizing rather than expensing these costs would therefore comply with GAAP, Checkosky suggested that Savin formulate a written policy on deferring start-up costs, which it did. *In re Checkosky*, 7 Fed.Sec. L.Rep. (CCH) ¶ 73,871, at 63,124 (Aug. 26, 1992).

Checkosky visited the Savin plant in January 1981, and examined a working photocopier. Savin's specifications required a photocopier producing 60 copies per minute with no more than 66 "failures" (problems a customer could not fix) per million copies. Checkosky timed the machine at 60 copies per minute and found the copies to be of good quality. *Id.* In October 1981, Arthur D. Little, Inc., reviewed the Savin project on behalf of a prospective investor and issued a report stating that the basic machine had a sound design and that Savin "will be able to demonstrate that it is a reliable and manufacturable product." *Id.* at 63,125.

By the following summer, however, Savin had produced only 20 or so new copiers, and these were proving unreliable. Savin engineers experienced difficulty in developing a toner that would produce high quality copies at high speeds. In June 1982, the company announced that it was pushing back the anticipated date for introducing its new photocopier line to January 1983. *Checkosky*, ¶ 73,871, at 63,125. Although in July 1982, the company managed to demonstrate its photocopier at the National Office Machine Dealers Association convention, the company continued working on the toner problems. Landa offered a new liquid toner, but when Savin engineers tried to incorporate it they found it to be incompatible with the photocopier's existing "fuser."

As 1982 drew to a close, Savin decided to abandon Project X and to direct its efforts toward developing a high end machine ultimately called "Pegasus" or the "8000 series." The company began work on reconfiguring one of its earlier designs. *Id.* While the original Project X copiers were to be tabletop models, Pegasus was to be a full-size console model. In April 1983, McKinsey & Company submitted a report to Savin for developing a business strategy regarding the Pegasus photocopier. One of the report's key assumptions was that Savin bring a highly reliable copier to market by July 1984. *Id.* In June 1984, McKinsey updated its study and noted that no working model of Savin's 8000 series copier had yet been built. *Id.*

In December 1985, Savin discontinued its photocopier project, never having sold or leased a single copier. *Id.*

The accountant's reports accompanying Savin's financial statements for the fiscal years ending in 1981, 1982 and 1983, contained the unqualified opinion that the information in them was fairly presented in conformity with GAAP. In these financial statements, which Savin filed as part of its Form

---

**9.** Checkosky testified that he also consulted a Price Waterhouse manual. It is unclear whether the ALJ or the Commission credited this testimony.

10–K, "deferred start-up costs" were listed as an asset. When Checkosky and Aldrich realized that Savin had slipped substantially behind in its production schedule, they had Coopers & Lybrand issue "subject to" audit opinions for the 1984 fiscal and calendar years, stating that Savin's financial statements were fairly presented in accordance with GAAP "subject to" the recoverability of the deferred costs, which "is dependent upon, among other things, timely commencement of commercial production and sale of a sufficient number of manufactured copiers at adequate profit levels." [10] By then Savin had deferred a total of $37 million.

After an extended evidentiary hearing, the Administrative Law Judge found that Checkosky and Aldrich had engaged in "improper professional conduct" in violation of Commission Rule 2(e)(1)(ii) by conducting audits not in conformity to GAAS and by certifying Savin financial statements not in compliance with GAAP. The ALJ issued an order denying both petitioners the privilege of practicing before the Commission for five years. The Commission, in a 3–1 decision, affirmed the ALJ's ruling, but reduced petitioners' suspensions from five to two years. On the basis of its "independent review of the record," the Commission found that Checkosky and Aldrich had misinterpreted FAS 2 as it applied to Savin and had violated GAAS "by failing to qualify their opinion on the issue of

whether the deferral of start-up costs was in accordance with GAAP." *Checkosky*, ¶ 73,-871, at 63,121. In an apparent reference to the audits for the fiscal years 1981 to 1984 and the calendar year 1984, the Commission also found that petitioners failed "to conduct the audit [sic]" in conformity with GAAS because they did not exercise sufficient skepticism and did not have sufficient evidence "to support their opinion [sic]." *Id.* As to the question whether Checkosky and Aldrich could be sanctioned under Rule 2(e)(1)(ii) without proof of scienter, as the ALJ had held, the Commission ruled that "proof of bad faith or willful misconduct is not a prerequisite...." *Id.*[11]

## C

### THE EVIDENCE REGARDING FAS 2

The parties dispute the sufficiency of the evidence in support of the Commission's conclusions that Checkosky and Aldrich misinterpreted GAAP and violated GAAS. Under section 7(c) of the Administrative Procedure Act, 5 U.S.C. § 556(d), the Chief Accountant had the burden of proving the charges by a preponderance of the evidence. *Steadman v. SEC*, 450 U.S. at 95–104, 101 S.Ct. at 1004–09. The Commission's factual conclusions must be sustained if they are supported by substantial evidence (15 U.S.C. § 78y(a)(4)), which according to the standard formulation

10. If the financial statements do not conform to GAAP in certain respects, the auditor's report may be qualified or adverse. If qualified, the report must now use the qualifying language "except for" or "except" or "with the exception of." AUDITING STANDARDS, AU §§ 508.38–39, 508.-49–53 (effective for reports issued or reissued on or after January 1, 1989); *contrast United States v. Arthur Young & Co.*, 465 U.S. at 819, 104 S.Ct. at 1503. The problem Checkosky and Aldrich identified in their 1984 reports—which they identified with a "subject to"—concerned a financial uncertainty. *See generally*, JERRY SULLIVAN ET AL., MONTGOMERY'S AUDITING 898 (10th ed. 1985).

11. Commissioner Roberts concurred in part and dissented in part from the portion of the majority opinion dealing with the accounting and auditing issues. He concurred in the Commission's finding that Checkosky and Aldrich incorrectly interpreted FAS 2 in conducting their audits, but only for fiscal years 1983 and 1984, and calendar year 1984. *Checkosky*, ¶ 73,871, at 63,131. He also found that petitioners violated GAAS, but only because incorrectly stating that financial state-

ments are in compliance with GAAP is a violation of GAAS. *Id.* Commissioner Roberts dissented from the order imposing sanctions because "the facts of this case are about the same age as petrified wood," and because he did not believe that petitioners' "incorrect interpretation of FAS 2 *ipso facto* constituted improper professional conduct within the meaning of Rule 2(e)(1)(ii)." *Id.* at 63,132. "Based on my examination of all the relevant evidence, I am unable to find that [petitioners'] conduct taken as a whole during their audits of Savin, was so deficient that disciplinary action is required to protect the Commission's processes." In his view, "the interpretation that [Checkosky and Aldrich] adopted was not without some basis" and their overall conduct "indicate[d] at least a minimum level of integrity and competence on their part." Commissioner Roberts found it unnecessary to address the question whether "a minimum scienter standard should apply in Rule 2(e) proceedings against accountants." *Id.* at 63,139 n. 13.

is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)), taking "into account whatever in the record fairly detracts from its weight" (*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)).

As to the conclusion that petitioners misread GAAP,[12] the essential question was whether Savin's costs on Project X were "research and development costs encompassed by" FAS 2. If the costs fell into this category—and the Commission found they did—it followed that Savin's financial statements did not conform to GAAP (the costs should have been expensed).

FAS 2 defines research and development costs and then gives examples of items typically included in, or excluded from, this description. "Research" is (FAS 2 ¶ 8(a)):

> planned search or critical investigation aimed at discovery of new knowledge with the hope that such knowledge will be useful in developing a new product or service (hereinafter "product") or a new process or technique (hereinafter "process") or in bringing about a significant improvement to an existing product or process.

"Development" is (FAS 2 ¶ 8(b)):

> the translation of research findings or other knowledge into a plan or design for a new product or process or for a significant improvement to an existing product or process whether intended for sale or use. It includes the conceptual formulation, design, and testing of product alternatives, construction of prototypes, and operation of pilot plants. It does not include routine or periodic alterations to existing products, production lines, manufacturing processes,

and other on-going operations even though those alterations may represent significant improvements and it does not include market research or market testing activities.

Among the nine examples of activities typically included in research and development are (FAS 2 ¶ 9(f) & (i)):

> (f) Design, construction, and testing of pre-production prototypes and models.
>
> . . . .
>
> (i) Engineering activity required to advance the design of a product to the point that it meets specific functional and economic requirements and is ready for manufacture.

Among the nine examples of activities not considered research and development are (FAS 2 ¶ 10(a), (d) & (h)):

> (a) Engineering follow-through in an early phase of commercial production.
>
> . . . .
>
> (d) Routine, on-going efforts to refine, enrich, or otherwise improve upon the qualities of an existing product.
>
> . . . .
>
> (h) Activity, including design and construction engineering, related to the construction, relocation, rearrangement, or start-up of facilities or equipment other than (1) pilot plants ... and (2) facilities or equipment whose sole use is for a particular research and development project....

Petitioners say that the costs Savin deferred were not within FAS 2 because only research and development aimed at producing "new technology" is covered. Their assumption must be that Savin's efforts regard-

---

12. The parties treat the issue regarding GAAP as one of "fact" subject to the substantial evidence test. I shall do the same, although I am not entirely certain that the issue is purely factual. What is "generally accepted" might be resolved by evidence. But the Commission was faced with a FASB pronouncement and no one disputed that FASs reflect generally accepted accounting principles. The meaning of a particular FAS seems not to be completely susceptible to proof adduced at a hearing. In that respect, a FASB statement may have more in common with a

regulation or a statute, or perhaps a contract. *Cf. NLRB v. Marcus Trucking Co.*, 286 F.2d 583, 590–91 (2d Cir.1961) (Friendly, J.). The text is there to be read and analyzed. Of course, there can be—as there was here—expert testimony about how others interpret the FAS, and the reasons behind the FASB's adoption of it. But when the Commission renders an opinion interpreting an FAS, one would expect it to be based not simply on such "evidence," but on the Commission's own reasoning from the language of the FAS.

ing its photocopier project, after the company started deferring costs, were not aimed at developing any new technology, an assumption we would have difficulty assessing on this record. There is, however, no reason to make the assessment because in our view the Commission (and the ALJ) properly rejected petitioners' version of FAS 2. The design of a model and its testing may or may not encompass new technology, yet in either event such activities are considered research and development under FAS 2. While FAS 2's definition of "research" refers to "new knowledge," it "in no way limits itself exclusively to costs incurred in discovering or developing a 'new technology.'" *Checkosky,* ¶ 73,871 at 63,127. Investigations aimed at improving existing products or processes fall within the category of "research"; "development" includes translating research findings into significant improvements in existing products. The phrase "new technology" does not appear in the definitional paragraphs of FAS 2, an omission that would be odd indeed if research and development were limited in the manner petitioners propose.[13]

Moreover, the Commission made the point that the purpose of FAS 2—apparent from its face and from expert testimony—would be defeated if costs could be deferred "simply because no new technology is involved, regardless of whether there is any objective evidence that the new product meets the manufacturer's stated functional and economic goals and can be readily manufactured." *Id.* Research designed to improve or refine what already exists, like research aimed at creating new technology, may lead to a dead end. If the costs of the project are deferred instead of charged against income each year, the company's profit picture is distorted. There is another side to this coin, as I mentioned earlier, but faced with a choice FAS 2 came down on the side of expensing the costs when incurred.

The Commission offered additional grounds for its view of FAS 2 and for its rejection of the contrary opinions expressed by at least some of petitioners' expert witnesses. *Id.* In favor of the Commission's

interpretation was the testimony of two witnesses who were involved in drafting FAS 2. What they said serves to provide further support for the Commission's interpretation. Both stated flatly that FAS 2 does not contain the sort of "new technology" criterion petitioners envisaged. And both said, in reliance on FAS 2 ¶ 9(i), that when a company is developing a product, "research and development" within FAS 2 continues until it "meets specific functional and economic requirements and is ready for manufacture." In other words, until it is time for manufacturing to begin, there are still uncertainties. Given the reasonableness of the Commission's view, its expertise in such matters and its justifiable reliance on the testimony of these experts, I would sustain this aspect of its decision.

The Commission's further finding that Savin's deferred costs "were obviously associated with prototype design, construction and testing, rather than with any of the examples falling outside the realm of FAS 2" is scarcely open to dispute. *See Checkosky,* ¶ 73,871, at 63,127–28. In conducting their 1981 and 1982 audits, Checkosky and Aldrich applied two benchmarks to determine whether Savin's project had passed out of research and development: (1) whether the company had developed an actual machine that it was going to produce; and (2) whether blueprints had been released from engineering to manufacturing. (Neither criterion, the Commission noted, mentioned "new technology.") *Id.* There is more than enough evidence to support the Commission's conclusion that even by petitioners' standards, Savin's expenditures should not have been deferred. As late as July 1984, engineering still had not released most of the blueprints for the Pegasus machine to manufacturing. *Id.* at 63,128 n. 23. In the meantime Savin had been incurring costs in trying to decrease the copier's failure rate and trying to develop a workable fuser. These activities fell squarely within one of FAS 2's examples of research and development that must be expensed. *See* FAS 2 ¶ 9(i). Expert testimony, on which the Commission was entitled to

---

13. The words do appear once, in an example dealing with the design of "tools, jigs, molds, and

dies," which is not research and development unless it involves new technology. FAS 2 ¶ 9(g).

rely (see *FPC v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 643, 30 L.Ed.2d 600 (1972)), established that no Savin photocopier ever became "ready for manufacture" and that none satisfied "specific functional and economic requirements" regarding reliability. *See Checkosky,* ¶ 73,871, at 63,128. Because Checkosky and Aldrich did not qualify their opinions regarding Savin's deferring costs that GAAP required to be expensed, the Commission properly found that they had not complied with GAAS.

### D

THE EVIDENCE REGARDING GAAS VIOLATIONS

The Commission also found that Checkosky and Aldrich had not conducted their examinations in accordance with GAAS. Under GAAS auditors must exercise "[d]ue professional care . . . in the performance of the audit and the preparation of the report" (AUDITING STANDARDS, AU § 150.02 (General Standard 3)); and must obtain "[s]ufficient competent evidential matter . . . through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." *Id.* (Standard of Field Work 3). Petitioners' transgression, in the Commission's view, was their failure to engage "in an inquiry calculated to test management's representations that at all times development, as that term is defined either by FAS 2 or Savin's own deferral policy, had been completed on the copier project." *Checkosky,* ¶ 73,871, at 63,128–29.

Petitioners mount a good case against the Commission's finding, but not good enough. Among the time-honored descriptions of "substantial evidence" is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury" (*Consolo v. FMC,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)), which leaves open the possibility of sustaining the agency's findings even though one might draw "two inconsistent inferences" from the evidence (*NLRB v. Nevada Consol. Copper Corp.,* 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305 (1942)). Petitioners were aware of the considerable problems Savin was having with its photocopier project, problems that resulted in its repeatedly postponing introduction of the copier, cancelling development of the original designs, laying off a significant number of employees and attempting to develop a reconfigured design. These events, the Commission reasonably concluded, should have alerted Checkosky and Aldrich to the need for "heightened vigilance" when they sought to confirm management's representations about the photocopier. *Checkosky,* ¶ 73,871, at 63,129. It is true that Checkosky personally inspected a working model of a Savin photocopier in January 1981, but it is far from clear whether he did anything to confirm that it was "ready for manufacture." Moreover, Checkosky admitted that he knew during the 1983 audit—by which time Savin had abandoned efforts to develop the first design—that it had no other working model. One of petitioners' tests for determining when the project had passed out of research and development was, as I have said, the delivery of blueprints to manufacturing. Yet evidence on which the Commission was entitled to rely indicated that petitioners did not check to see if Pegasus blueprints had been so delivered until July 1984 (not all had been delivered to manufacturing even by then). *Checkosky,* ¶ 73,871, at 63,129 n. 34. Petitioners did take other steps during the audits. Under their view of the evidence, they did enough to convince themselves that Savin could overcome such difficulties as paper jams, toner leaks and excess heat. Perhaps so. The question, however, is not whether they believed Savin could surmount those and other problems with the photocopier. It is whether they tested management's representations, obtained adequate evidence to confirm those representations, and then conducted their own analysis to determine whether the costs Savin was expending in the effort to solve the problems constituted research and development. On that score, the Commission's decision that Checkosky and Aldrich fell short, and thus failed to act in accordance with GAAS, is sufficiently supported by the record and I

would not disturb it.[14]

\* \* \* \* \* \*

It is appropriate here to add a note of caution. My opinion is not that Checkosky and Aldrich violated GAAS. And it is not that they acted negligently in performing their audits. I have decided only that there is enough evidence in the record to support the Commission's findings. Whether a decision-maker in another proceeding involving the same evidence could reach a different conclusion is another matter entirely and I express no views on the subject.

## IV

### SCIENTER AND RULE 2(e)(1)(ii)

The next question is whether, as the Commission held, it may suspend accountants under Rule 2(e)(1)(ii) without finding that they acted with scienter. The Commission has not adequately justified this aspect of its decision and, for that reason, I would vacate its order and remand.

The effect of a Commission suspension order should not be underestimated. A proceeding under Rule 2(e) threatens "to deprive a person of a way of life to which he has devoted years of preparation and on which he and his family have come to rely." Henry J. Friendly, *"Some Kind of Hearing,"* 123 U.PA.L.REV. 1267, 1297 (1975). It is of little comfort to an auditor defending against such charges that the Commission's authority is limited to suspending him from agency practice. For many public accountants such work represents their entire livelihood. Moreover, when one jurisdiction suspends a professional it can start a chain reaction. In states like Connecticut, where Checkosky and Aldrich are presumably licensed as certified public accountants, a Commission suspension order can result in a reciprocal state suspension, thereby depriving the individual of his license to practice. CONN.GEN.STAT. ANN. § 20–281a(a)(4) (West Supp.1993). To these considerations must be added the dan-

gers associated with treating GAAP and GAAS as if they constituted a clear and simple code. "The complexity of generally accepted accounting principles and generally accepted auditing standards is belied, and perhaps obscured, by their familiar acronyms." Strother, *supra,* 28 VAND.L.REV. at 201. Accounting principles must be interpreted. Judgments must be made about specific transactions. "[R]easonable preparers of financial statements"—often management—"and auditors can disagree about those interpretations and judgments." MONTGOMERY'S AUDITING, *supra* note 10, at 19.

There is substantial evidence to support the Commission's findings regarding petitioners' compliance with GAAS. Whether Checkosky and Aldrich violated Rule 2(e) is another matter. They were not called upon to defend against charges of fraud, or willful violations of the securities laws, or even lack of good faith. The case against them proceeded on a different basis. Their "improper conduct" under Rule 2(e)(1)(ii), according to the ALJ's decision, consisted in their not doing all that GAAS required of them. *See generally* AUDITING STANDARDS, AU § 150.02. The ALJ ruled specifically that they could be suspended from practice without any proof of scienter or bad faith.

When the case reached the Commission, petitioners challenged the ALJ's interpretation, arguing that scienter had to be charged, and that the Commission had so stated as recently as *In re Carter,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,847 (Feb. 28, 1981), a Rule 2(e) proceeding against lawyers. In response, the Commission held that it could suspend accountants under Rule 2(e)(1)(ii) for "improper professional conduct" without any showing of "bad faith, recklessness or willful misconduct," and that "mere negligence" would suffice. *Checkosky,* ¶ 73,-871, at 63,130.

---

**14.** During the hearing, the ALJ refused to allow petitioners to cross-examine the Chief Accountant's expert witness on auditing, Ernest Ten Eyck, for bias. Because there is substantial evidence for the Commission's findings without Ten

Eyck's testimony and because the Commission's reliance on his testimony appears to have been minimal at best, *see Checkosky,* ¶ 73,871, at 63,-128 n. 26, I do not pass on petitioners' claim that the ALJ's ruling constituted error.

## A

### THE COMMISSION HELD THAT A NEGLIGENCE STANDARD APPLIES TO VIOLATIONS OF RULE 2(e)(1)(ii)

Judge Silberman's separate opinion stands—or, as I think, falls—on a supposed lack of clarity in the Commission's ruling regarding whether mere negligence suffices to make out an auditor's violation of Rule 2(e)(1)(ii). While my colleague professes to be baffled about what the Commission decided, no one else shares his confusion. Judge Reynolds and I know what the Commission determined, as does everyone who is in the least bit familiar with this case—the Commission decided that negligence is enough.

The Commission told this court that it had decided the case on a negligence standard—the caption heading at page 43 of its brief is "The Commission Has Correctly Determined that Negligent Conduct Is a Sufficient Basis for Imposing Discipline for Improper Professional Conduct."

Petitioners so understood the Commission's ruling and argued against it, distinguishing for example *Touche* and *Davy* as cases not allowing sanctions for mere negligence. Brief for Petitioners at 35 n. 11.

The able counsel for the *amici* national accounting firms also understood that the basis for the Commission's imposition "of this sanction was that petitioners had been negligent." Brief of *Amici Curiae* Arthur Anderson & Co., Deloitte & Touche, Ernst & Young and KPMG Peat Marwick at 2.

Prominent securities law experts now cite the Commission's opinion for the proposition that the Commission need only prove negligence to sanction auditors under Rule 2(e)(1)(ii). *See, e.g.,* Joel Seligman, *Accounting and the New Corporate Law,* 50 WASH. & LEE L.REV. 943, 957 (1993); ROBERT J. HAFT, LIABILITY OF ATTORNEYS AND ACCOUNTANTS FOR SECURITIES TRANSACTIONS § 8.03, at 8–16 (1993–94 ed.).

No one, in any brief or in oral argument, even hinted at the idea, sponsored by Judge Silberman, that the Commission's opinion was unclear on this point.[15]

No one made that argument because the Commission's opinion on this subject is as plain as can be. The Commission relied (improperly, *see infra* Part IV.C) on an unpublished opinion for the principle that when it comes to auditors, "mere negligence" suffices under Rule 2(e)(1)(ii). The Commission stated that the unpublished opinion supported the ALJ's ruling, which also decided that negligence was enough. The Commission then rounded things off by stating this: **"we have stated that a mental awareness greater than negligence is not required to impose sanctions against an accountant pursuant to Rule 2(e)."** *Checkosky,* ¶ 73,-871, at 63,130.

Judge Silberman thinks the statement just quoted might refer to older Commission opinions and have nothing to do with the case at hand. Silberman op. at 459. One could also say that it might refer to statements the Commissioners made over lunch. Both are about as plausible. When the Commission wrote "we have stated," it was not looking back to the distant past; it was looking at its two preceding sentences, which said that departures from GAAS did not need to be accompanied by "bad faith, recklessness, or willful misconduct" in order to violate Rule 2(e)(1)(ii).[16] *Checkosky,* ¶ 73,871, at 63,130. GAAS requires the exercise of due professional care. *See infra* note 26. To those who know this—that is, to all accountants and all lawyers who practice in the area—stating that an auditor violated this generally

15. There was a time when Judge Silberman believed that if—as in this case—the parties agree on a "nonjurisdictional issue," it is improper for a court to disagree. *See Independent Ins. Agents of Am., Inc. v. Clarke,* 955 F.2d 731, 741–44 (D.C.Cir.1992) (Silberman, J., dissenting), *rev'd sub nom. United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.,* — U.S. —, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). To do otherwise, according to a dissenting opinion of my colleague, would fail to respect the adversary system. *United States v. Pryce,* 938 F.2d 1343, 1353 (D.C.Cir.1991), *cert. denied,* — U.S. — *and* —, 112 S.Ct. 1488 *and* 1679, 117 L.Ed.2d 629 *and* 118 L.Ed.2d 396 (1992).

16. Of course, the Commission believed that agency precedent supported this conclusion. As Judge Silberman seems to agree, and as I later discuss (*infra* Part IV.D), that conclusion cannot survive close attention.

accepted auditing standard is the same as stating that the auditor acted negligently. The Commission's summary of its opinion, *Checkosky,* ¶ 73,871, at 63,121, thus announces that when accountants violate GAAS they violate Rule 2(e)(1)(ii). This makes things clear to all concerned, save one.

## B

### THE COMMISSION IMPROPERLY ADDED A CHARGE OF RECKLESS CONDUCT

After rejecting petitioners' argument that Rule 2(e)(1)(ii) required a showing of scienter, the Commission "note[d]" that in any event Checkosky and Aldrich acted recklessly because they "ignored or overlooked numerous 'red flags,' . . . that should have heightened their skepticism." *Checkosky,* ¶ 73,871, at 63,130. This is not an acceptable alternative ground for sustaining the Commission's suspension order.

In disbarment or suspension proceedings, the accused is entitled to notice of the charges, the charges "must be known before the proceedings commence," and additional charges may not be added after the proceedings are "underway." *In re Ruffalo,* 390 U.S. 544, 550–52, 88 S.Ct. 1222, 1225–27, 20 L.Ed.2d 117 *modified on other grounds,* 392 U.S. 919, 88 S.Ct. 2257, 20 L.Ed.2d 1380 (1968). The only charges against Checkosky and Aldrich were that they acted negligently. GAAS requires the exercise of due professional care (*see infra* note 26) and the Chief Accountant alleged that petitioners had not lived up to this standard, in part because they misinterpreted GAAP. The Commission's Order for Private Proceedings provided that a hearing would be held *on the Chief Accountant's allegations,* which the Order set forth. Petitioners not only defended against the charge of negligence but also

argued that more had to be alleged before they could be subject to sanctions under Rule 2(e). Yet as they state without contradiction, "there was no accusation concerning Petitioners' state of mind at any time during the prehearing proceedings, the hearing itself, or the post-hearing briefing." Brief for Petitioners at 29 n. 9. The ALJ, of course, expressly refused to require such accusations, ruling that none were necessary under Rule 2(e)(1)(ii).

To say at the last minute, as the Commission did, that Checkosky and Aldrich acted recklessly is—contrary to Judge Silberman—to add new charges against them. Nearly every court of appeals, including ours, has held that under *Ernst & Ernst* recklessness suffices to provide the element of intent for a violation of the securities laws. *See, e.g., O'Connor v. R.F. Lafferty & Co.,* 965 F.2d 893, 899 (10th Cir.1992); *Robin v. Arthur Young & Co.,* 915 F.2d 1120, 1126 (7th Cir. 1990), *cert. denied,* 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991); *Van Dyke v. Coburn Enterprises, Inc.,* 873 F.2d 1094, 1100 (8th Cir.1989); *Deutschman v. Beneficial Corp.,* 841 F.2d 502, 505 (3d Cir.1988), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989); *Dirks v. SEC,* 681 F.2d 824, 844–45 (D.C.Cir.1982), *rev'd on other grounds,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). The Commission's line that petitioners acted recklessly is tantamount to a finding that they violated the securities laws, that their public statements Savin filed with the agency were false and misleading and that petitioners prepared them with the requisite intent. The Commission admitted just that during oral argument (Tr. 45).[17] Yet the Chief Accountant, throughout the entire proceedings, **specifically disclaimed any intention** of pursuing securities act charges against these auditors, charges which—again contrary to Judge Sil-

---

17. The Commission argued that in finding recklessness, it had satisfied the standard set forth in *SEC v. Steadman,* 967 F.2d 636, 641–42 (D.C.Cir. 1992) (citations omitted): "[t]he kind of recklessness required, . . . is not merely a form of ordinary negligence; it is an 'extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Although I believe it unnecessary to decide the

question, I seriously doubt whether the evidence supports such a finding. The Commission itself must have entertained considerable doubts on that score. Later in its opinion the Commission said that a suspension of five years was too long because petitioners' conduct did not "rise[] to the level of aiding and abetting violations of the securities antifraud provisions." *Checkosky,* ¶ 73,871, at 63,131. That statement contradicts the Commission's position at oral argument.

berman—the Commission could have pursued in a disciplinary proceeding if it had invoked Rule 2(e)(1)(iii), rather than Rule 2(e)(1)(ii), against petitioners.[18] Had the allegations been different, had the charges had been in the nature of aiding and abetting violations of § 10(b) for instance, petitioners likely would have defended the case differently. *Cf. Central Bank of Denver v. First Interstate Bank of Denver*, — U.S. —, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). One defends a murder case differently than a case involving only a charge of manslaughter. Petitioners may have called expert witnesses who, although disagreeing with their view of FAS 2, would testify that petitioners' interpretation, while not rising to the level of due care, nevertheless did not amount to recklessness. Petitioners' cross-examination of the Commission's experts also would have been very different if they were defending against a charge of recklessness. Furthermore, at the time a charge of reckless conduct might have upped the ante so much in terms of liability for damages that petitioners, had they been so charged, might have considered settling with the Commission (as Savin did) in order to avoid the enormous exposure litigating the issue would entail.

In short, when the case reached the Commission on appeal it was far too late to add a charge of recklessness in order to support the suspension order.

## C

### THE COMMISSION IMPROPERLY RELIED ON AN UNPUBLISHED DECISION

The Commission gave three reasons for its determination that despite its decision in the *Carter* case involving lawyers, here mere negligence was enough. Of the three, the last opened on a patently invalid note:

> Third, six years after *Carter* was decided, the Commission in *Schulzetenberg* specifically reaffirmed the negligence standard with respect to accountants' liability under Rule 2(e). As we recognized there, "... an incompetent or negligent auditor can do just as much harm to public investors and others who rely on him as one who acts with an improper motive." *Schulzetenberg* op. at 2.

*Checkosky*, ¶ 73,871, at 63,130. Petitioners complain—and rightly so—that *Schulzetenberg* is secret law. The Commission never published its opinion in the case, which it rendered in support of its order denying a motion to dismiss. The ALJ did not mention *Schulzetenberg* in her lengthy opinion. It is missing from reporting services such as CCH and BNA. Even the usually all-inclusive electronic data bases like LEXIS and WESTLAW do not have it. Using *Schulzetenberg*, and its interpretation of Rule 2(e), against petitioners was not simply improper. It violated federal law. The Freedom of Information Act, 5 U.S.C. § 552(a)(2), forbids agencies from relying on, using, or citing as precedent, opinions or interpretations that have not been made available to the public in accordance with agency rules.[19] The Commission's rules require its adjudicatory orders and final opinions to be "published weekly in a document entitled 'SEC Docket.'" 17 C.F.R. § 200.80(a)(2).[20] When the Commission invoked *Schulzetenberg* in this

18. Rule 2(e)(1)(iii) states (17 C.F.R. § 201.-2(e)(1)(iii)):
    (1) The Commission may deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the Commission after notice of and opportunity for hearing ... (iii) to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws (15 U.S.C. 77a to 80b–20), or the rules and regulations thereunder.

19. This requirement prevents "a citizen from losing a controversy with an agency because of some obscure or hidden order or opinion which the agency knows about but which has been unavailable to the citizen simply because he had no way to discover it." H.R.REP. No. 1497, 89th Cong., 2d Sess. 8 (1966).

20. At oral argument, Commission counsel informed the court that *Schulzetenberg* was listed in an index available to "SEC attorneys," which I understand to mean that one could review the index in the public reference room of the Commission's offices in Washington, D.C., or presumably in the Commission's regional offices. Indexing is an additional requirement under § 552(a)(2)(i). Agencies are required to maintain "current indexes" under § 552(a)(2). The Commission's regulations implementing § 552 provide that "[c]urrent indices" are "published quarterly or more frequently" (17 C.F.R. § 200.-80(a)(2)(v)).

case, it could not cite to SEC Docket; the decision is not there.[21]

To make matters worse, the quotation the Commission plucked from *Schulzetenberg* embodies a rejected rationale. In *Ernst & Ernst v. Hochfelder*, the Commission offered precisely the same argument to the Supreme Court in support of its position that negligent accountants ought to be held liable under Rule 10b–5. The Supreme Court said this: "The Commission ... reasons that ... the 'effect' upon investors of given conduct [by accountants] is the same regardless of whether the conduct is negligent or intentional.... The logic of this effect-oriented approach would impose liability for wholly faultless conduct where such conduct results in harm to investors, a result the Commission would be unlikely to support." 425 U.S. at 198, 96 S.Ct. at 1383.

Furthermore, to the extent the Commission's citation of *Schulzetenberg* was meant to suggest that it had already decided to apply *Carter* only to lawyers, not accountants, it is misleading. *Schulzetenberg* does not even mention *Carter*, let alone try to distinguish it. Nor do the facts of *Schulzetenberg* demonstrate sanctions being applied for negligent conduct. According to the report of the settlement of the case, which is published, the Commission's case against the accountant was for willful misconduct. *In re Schulzetenberg*, [1987–1991 Accounting and Auditing Releases Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 73,669, at 63,158 (Sept. 23, 1988). The Commission acknowledged as much in its unpublished decision: "the very misconduct with which Schulzetenberg is charged, has been held to be willful miscon-

duct." *In re Schulzetenberg*, Admin.Proc. No. 3–6881, slip op. at 3 (Nov. 10, 1987).

For these reasons, *Schulzetenberg* lends no support to the Commission's decision.

### D

### THE COMMISSION FAILED TO DISTINGUISH *CARTER*

The Commission's opinion in this case is its first effort to articulate why, despite *Carter* and its stress on the need for establishing scienter in Rule 2(e) cases, no such showing needs to be made when auditors are charged under Rule 2(e)(1)(ii). One of the abiding principles of administrative law is that when agencies refuse to treat like cases alike, they act arbitrarily, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See, e.g., Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C.Cir.1989); *FEC v. Rose*, 806 F.2d 1081, 1089 (D.C.Cir.1986). If an agency believes that factual variations should lead to variations in the interpretation and application of its rules, it must do more than simply point out differences between the cases. It is unacceptable for counsel at oral argument to answer the court's hypothetical with a simple "That's not this case." It is just as unacceptable for an agency to distinguish its precedent on the same basis. Everyone can see that the facts of *Carter* differ from the facts of this case. Carter, and his partner Johnson, were outside lawyers rendering legal advice to a company regarding its disclosure obligations. While both were charged with violating Rule 2(e)(1)(ii), the *Carter* opinion also discussed the additional Rule 2(e)(1)(iii) charges against them of willfully

---

"John M. Schulzetenberg (File No. 3–6881, 11/10/87)" does appear on page 160 of a document entitled *Supplement to Index to Commission Decisions, March 16, 1987 through December 31, 1989*. The heading is "Negligence of Accountant, Sufficient Basis for Action." Nothing more is reported about the matter. Although the Commission decided *Schulzetenberg* in November 1987, and although the regulations contemplate quarterly indices, the Commission's Office of the General Counsel did not prepare the *Supplement to Index* until February 1990. (The *Supplement* indicates that there were "[t]wo previous editions of the Index, covering the periods July 1, 1966 through June 30, 1975 and July 1, 1975 through March 15, 1987 respectively." *Id.* at i.)

Thus, even if Checkosky and Aldrich had asked to see the "current" index in the Commission's reference room before their 1988 hearing or before they filed their brief with the Commission in December 1989, they would have discovered nothing about any unpublished ruling in *Schulzetenberg*.

**21.** The Commission designated the case "*In re Schulzetenberg*, Admin.Proc. 3–6881, slip op. at 2 (Nov. 10, 1987)." *Checkosky*, ¶ 73,871, at 63,130; *see also* Brief of the Securities and Exchange Commission at vii & 43.

aiding and abetting their client's violations of sections 10(b) and 13(a) of the 1934 Act, and Rules 10b–5, 12b–20 and 13a–11 thereunder. 15 U.S.C. §§ 78j(b) & 78m(a); 17 C.F.R. §§ 240.10b–5, 240.12b–20 & 240.13a–11; *see Carter*, ¶ 82,847, at 84,146. The Commission's opinion here mentioned these differences, but it fell far short of providing any reasoned explanation to show why they should matter.

Decided in 1981, *Carter* represents the Commission's most comprehensive discussion of the history, purpose and operation of Rule 2(e). As outside counsel for the National Telephone Company, Carter and Johnson prepared registration statements, proxy materials, an annual report, other Commission filings, press releases and various communications with the company's shareholders. *Carter*, ¶ 82,847, at 84,152–53. Because some of this material was false and misleading, National violated the securities laws. National also committed continuing violations by failing to disclose its deteriorating cash position in other filings and public statements. *Id.* at 84,168.

The Commission held that Carter and Johnson could not be sanctioned under Rule 2(e)(1)(iii) for willfully aiding and abetting National's violations, unless they "were aware or knew that their role was part of an activity that was improper or illegal." *Id.* at 84,167. In explaining why, the Commission said—in language that is broad enough to encompass all of Rule 2(e)(1) and all professionals subject to the Rule—that "wrongful intent"

> provides the basis for distinguishing between those professionals who may be appropriately considered as subjects of professional discipline and those who, acting in good faith, have merely made errors of judgment or have been careless.

*Id.* The Commission reasoned that if a securities lawyer is to exercise his "best independent judgment ... he must have the freedom to make innocent—or even, in certain cases, careless—mistakes without fear of [losing] the ability to practice before the Commis-

sion." *Id.* Otherwise, lawyers "motivated by fears for their personal liability will not be consulted on difficult issues." *Id.*

Why these principles would not apply equally to auditors prosecuted under Rule 2(e)(1)(ii) for "improper professional conduct" is far from evident. The Commission's opinion in this case does nothing to answer the question. The Commission devoted but one sentence to the subject: "Second, *Carter* addressed the standard for willful aiding and abetting liability under Rule 2(e)(1)(iii), a provision not at issue in this matter. *See In re Bamberg*, 45 SEC Docket 945, 950 n. 11 (Feb. 5, 1990)." *Checkosky*, ¶ 73,871, at 63,-130.[22] As an observation, the sentence is accurate. As an explanation, it is inadequate. It simply leaves the question where the Commission found it.

Earlier in its *Carter* opinion, the Commission stated that subsections (i), (ii) and (iii) of Rule 2(e)(1) were of a piece. Each subsection shared the "same focus"; each "reflect[ed] the same concerns"; and each was directed at the same goal of protecting the "integrity of the Commission's processes." *Carter*, ¶ 82,847, at 84,150. Since "wrongful intent" distinguishes those "professionals" worthy of suspension from those who should not be sanctioned, as *Carter* indicated, one is left to wonder why it matters which of Rule 2(e)(1)'s subsections is involved. To be sure, only subsection (iii) specifically includes the word "willfully." But even if the term is not incorporated in subsection (ii), it does not necessarily follow that "improper conduct" entails no element of scienter. There may be something short of willful conduct and yet more culpable than mere negligence. *Compare Ratzlaf v. United States*, —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), *with Steadman*, 967 F.2d at 641–42.

On the other hand, suppose some sort of scienter is required *only* in prosecutions under Rule 2(e)(1)(iii). Must one conclude that professional conduct not subject to sanction under subsection (iii) may nevertheless result in a suspension when the Commission chooses to proceed under subsection (ii)? The

---

**22.** The footnote in *Bamberg* merely explains that "willfully" does not mean intent to defraud and that *Carter* did not hold otherwise.

problems this would raise—none of which the Commission addressed in its opinion in this case—are troublesome. There is the prospect that subsection (iii) would be rendered superfluous, engulfed completely by subsection (ii)'s less stringent standard. *See Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 562, 110 S.Ct. 2126, 2132, 109 L.Ed.2d 588 (1990). There is also the difficulty of squaring such a scheme with *Carter's* insistence that scienter properly serves to identify those deserving of discipline and those who should not be sanctioned.

The concluding sentence in *Carter*'s chain of reasoning, quoted above, raises still another question the Commission left dangling in this case. *Carter* said that without a scienter requirement, lawyers would slant their advice out of fear of incurring liability, and management therefore would not consult them on difficult questions. I cannot see why this sort of reasoning would not apply as well to auditors. I recognize that although companies need not retain outside counsel, they are legally compelled to "consult" independent accountants; annual financial statements must be certified. This creates an obligation on the part of management to cooperate with and provide information to the auditor. Otherwise the accountant's report cannot express an opinion. AUDITING STANDARDS, AU § 508.70; *see also* MONTGOMERY'S AUDITING, *supra* note 10, at 925. There are, however, degrees of cooperation. Encouraging management to be completely candid with its auditor about difficult accounting issues may be just as desirable as encouraging management to consult candidly with outside lawyers, and for similar reasons.[23] If imposing discipline on lawyers for negligence would be counterproductive, as *Carter* determined, it is not immediately apparent why the same would not be true with respect to accountants. *See* Werner F. Ebke, *In Search of Alternatives: Comparative Reflections on Corporate Governance and the Independent Auditor's Responsibilities*, 79 Nw. U.L.REV. 663, 691–93 (1984). And yet the Commission never supplied any written analysis to back up its apparent judgment that *Carter's* reasoning with respect to Rule 2(e)(1)(iii) and lawyers is inapposite for auditors charged under Rule 2(e)(1)(ii).

In addition to analyzing Rule 2(e)(1)(iii), *Carter* spoke directly to Rule 2(e)(1)(ii). After discussing Rule 2(e) generally and how the Commission expected to apply the Rule to "securities professionals," the Commission announced its "interpretation of 'unethical or improper professional conduct' as that term is used in Rule 2(e)(1)(ii)." *Carter*, ¶ 82,847, at 84,170. "Improper professional conduct" could not occur, the Commission held, until a lawyer *"becomes aware that his client is engaged in a substantial and continuing failure"* to satisfy federal securities laws, to which the Commission added that "[s]o long as a lawyer is acting *in good faith* and exerting reasonable efforts to prevent violations of the law ... his professional obligations have been met." *Id.* at 84,172–73 (emphasis added).[24] These statements certainly imply that, as the Commission interprets Rule 2(e)(1)(ii), lawyers who act in good faith cannot be sanctioned. Yet in this case the Commission rejected that standard for auditors. Why? The language of Rule 2(e)(1)(ii) makes no distinctions between professionals: it applies to "any person" who practices before the Commission. 17 C.F.R. § 201.2(e)(1).

The Commission's only response appears in its first reason for distinguishing *Carter*, which I quote in full:

> First, *Carter* explicitly acknowledged the differences in the duties attorneys owe to their clients and the duties auditors owe to the public.
>
> Accountants, of course, issue audit reports that speak directly to the investing

---

23. Under GAAS, an auditor is not to act like a "prosecutor." AUDITING STANDARDS, AU § 220.02. Auditors also have an obligation not to disclose their client's confidential information. CODE OF PROFESSIONAL CONDUCT, Rule 301. Otherwise clients will not be as forthcoming with their auditors. MONTGOMERY'S AUDITING, *supra* note 10, at 84.

24. On September 21, 1981, the Commission requested public comment on a proposed standard of conduct for professionals, *see Standard of Conduct Constituting Unethical or Improper Professional Practice Before the Commission*, Securities Act Release No. 6344, 23 S.E.C. Docket 826 (1981), but it never acted on the proposal.

public and publicly represent that the code of conduct embodied in the statements of auditing standards promulgated by the AICPA has been followed. The duty of accountants to those who justifiably rely on those reports is well-recognized. But the traditional role of the lawyer as counselor is to advise his client, not the public, about the law.

*Carter, supra,* at 84,150.

*Checkosky,* ¶ 73,871, at 63,130. It is uncertain where the Commission intended to go with this. Counsel for the Commission urges us to read between the lines. The idea, we are told, is that lawyers owe a duty to their client whereas accountants owe a duty directly to the investing public. Brief of the Securities and Exchange Commission at 47.[25] Therefore, one should not "minimize the distinction between lawyers and accountants, with respect to their role in the disclosure process." *Id.* The point is elusive.[26]

The federal securities laws do not make culpability turn on the nature of the professional. Accountants, for example, cannot be held liable under section 10(b) of the 1934 Act for negligent conduct any more than lawyers can. For purposes of Rule 2(e)(1)(ii), a distinction between the two professions on the basis of their relative importance to the administration of the securities laws would be difficult to justify. *Carter* itself recognized "[t]he important role which professionals, particularly attorneys and accountants, play in assuring adherence to the federal securities laws...." *Carter,* ¶ 82,-

847, at 84,148 (quoting *In re Keating, Muething & Klekamp,* 17 S.E.C. Docket 1149, 1165–66 (July 2, 1979) (concurring opinion of Chairman Williams)). Former Chairman Williams went on to say that "both professional groups have an equally vital role to play under the scheme of the federal securities laws...." *In re Keating,* 17 S.E.C. Docket at 1165 n. 10 (concurring opinion of Chairman Williams). According to *Carter,* "the task of enforcing the securities laws rests in overwhelming measure on the bar's shoulders...." *Carter,* ¶ 82,847, at 84,150 n. 21 (quoting *In re Emanuel Fields,* 45 S.E.C. 262, 266 n. 20 (1973), *aff'd without opinion,* 495 F.2d 1075 (D.C.Cir.1974)).[27] It is lawyers who prepare "prospectuses, proxy statements, opinions of counsel, and other documents that [the Commission], [its] staff, the financial community, and the investing public must take on faith." *In re Emanuel Fields,* 45 S.E.C. at 266 n. 20. Except for the auditor's opinion concerning the company's financial statements, "virtually everything else in the registration statement bears the imprint of counsel." A.A. Sommer, Jr., *The Emerging Responsibilities of the Securities Lawyer,* [1973–1974 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 79,631, at 83,688 (1974).

Before the decision in this case, it was therefore said with confidence that "[n]either Rule 2(e), nor the courts' recognition of it, ha[s] ever drawn a distinction between accountants and attorneys." *In re Keating,* 17 S.E.C. Docket at 1165 n. 10 (concurring opinion of Chairman Williams).[28] If the Commis-

---

**25.** Of course accountants also owe duties to their clients, such as keeping confidential information confidential. *See supra* note 23.

**26.** The AICPA Code of Professional Conduct demands adherence to GAAS. CODE OF PROFESSIONAL CONDUCT, Rule 202. One of GAAS's General Standards is that "[d]ue professional care is to be exercised in the performance of the audit and the preparation of the report." AUDITING STANDARDS, AU § 150.02 (General Standard 3). The *amici* report that a majority of state statutes "permit governing boards to suspend or revoke an accounting license only for '[d]ishonesty, fraud or gross negligence,' not for mere negligence. D.C.Code Ann. § 2–115(3)(B) (1988)." Brief of *Amici Curiae* Arthur Anderson & Co., Deloitte & Touche, Ernst & Young and KPMG Peat Marwick at 11 n. 3, citing the laws of 30 states. The Commission has not indicated why a failure to

adhere to this portion of GAAS, without more, should warrant a suspension when a majority of state bodies who enforce ethical standards for accountants view the matter differently.

**27.** *See generally* Reynold Kosek, *Professional Responsibility of Accountants and Lawyers Before the Securities and Exchange Commission,* 72 LAW LIBR.J. 453, 455 (1979) ("Today the SEC is emphasizing the similarities of the public duty of lawyers and accountants rather than the differences between the two professions."); Harold M. Williams, *Corporate Accountability and the Lawyer's Role,* 34 BUS.LAW. 7, 8 (1978).

**28.** The Commission indicated in an earlier decision that scienter was required under Rule 2(e)(1)(ii) for at least one type of GAAS violation:

[I]f the evidence showed that [respondent] in good faith held himself out as an independent

sion intends to draw that distinction now, for the first time in its history, it must articulate a rationale for doing so and it must explain why the varying roles of accountants and lawyers translate into varying standards under a rule that makes the same language applicable to both. *Carter* points in one direction, this case in another. "[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Advanced Micro Devices v. CAB,* 742 F.2d 1520, 1542 (D.C.Cir. 1984) (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971)).

For these reasons, I would vacate the Commission's order and remand the case so that the Commission may justify its decision in accordance with the views expressed in this opinion.[29]

## V

### DISCOVERY INTO THE COMMISSION'S DELIBERATIONS

■ The next issue concerns the Commission's refusal to permit Checkosky and Aldrich to depose Commission members and staff about alleged irregularities in its decisionmaking. A chronology needs to be recounted.

The Commission heard oral argument in the case on April 23, 1991.[30] One month later, one of the agency's five commissioners—Commissioner Philip Lochner, Jr.—announced that he was leaving the SEC, and did so in June 1991.

On February 10, 1992, while the case was still pending, an article in Business Week reported that before Commissioner Lochner departed, three Commissioners, "in a confidential vote last summer," voted "to overturn the harsh sanction" imposed by the ALJ. Dean Foust, *Is Breeden Too Ambitious for the SEC's Good?,* BUS. WK., Feb. 10, 1992, at 115, 116. According to the article, Chairman Breeden "refused to process the other commissioners' decision until after Commissioner Philip Lochner, Jr., who had voted to overturn the sanction, resigned as scheduled last June." *Id.* The article did not say whether Chairman Breeden had voted. (It incorrectly stated that the Commission's Enforcement Division—rather than the Office of Chief Accountant—brought the charges against Checkosky and Aldrich.)

In an effort to obtain information regarding this allegation, counsel for Checkosky and Aldrich met with members of the Commission's staff, who denied that a final vote had been taken or that a final decision had been reached. When petitioners' counsel

---

accountant, we should not hold him to be lacking in character or integrity or to have engaged in improper and unethical professional conduct....

*In re Logan,* 10 S.E.C. 982, 985 (1942). For reasons that are not apparent, the Commission did not cite *Logan* in its opinion in this case. It did cite *In re Haskins & Sells,* [1937–1982 Accounting Series Releases Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 72,092 (Oct. 30, 1952), a Rule 2(e) proceeding against accountants which contained the following sentences: "We accept respondents' assertion that they acted in good faith and accordingly do not find any willfulness in the sense referred to by them. However, in a disciplinary action under Rule II(e) we are not required to make such a finding." *Id.* at 62,197. There was no citation or explanation for these statements. *Haskins* did not purport to overrule *Logan;* indeed it did not even mention *Logan.* Exactly what *Haskins* meant by the qualifier "in the sense referred to by them" is unclear. Commissioner Roberts recognized that the two cases are inconsistent "to some extent." *Checkosky,*

¶ 73,871, at 63,139 n. 13. Furthermore, he concluded that "[e]ven the *Haskins & Sells* decision ... indicates that a violation of GAAP or GAAS does not *ipso facto* constitute improper professional conduct under Rule 2(e)(1)(ii)." *Id.* Commissioner Roberts reached this conclusion because *Haskins & Sells* used the phrase "so deficient" to describe the conduct in that case. *Id.* At any rate, *Haskins'* broad assertion—that in a "disciplinary action under II(e)" findings of lack of good faith and willfulness are unnecessary—is contrary to the Commission's later decision in *Carter.*

**29.** It is therefore unnecessary to reach petitioners' argument that because they were unlikely to commit future violations, the Commission should not have suspended them for two years. *See SEC v. Steadman,* 967 F.2d at 647–48.

**30.** The Commission's Chairman, Richard Breeden, did not attend the argument but participated in the decision, as the rules allow. 17 C.F.R. § 201.21(f).

asked about the status of the Commission's deliberations, staff members refused to disclose any specific information, but did describe generally how the Commission processed appeals.

Shortly thereafter, petitioners filed a discovery motion with the Commission and an application in the United States District Court for the District of Columbia for an order allowing them to perpetuate testimony and preserve evidence pursuant to Rule 27 of the Federal Rules of Civil Procedure.

After the Commission filed its opposition to petitioners' Rule 27 application, Commissioner Edward H. Fleischman wrote a letter to Judge Oberdorfer, to whom the case had been assigned, stating: "I feel duty bound to advise you that, for reasons I cannot reveal in a letter made part of the public record on this Application, I disagree with arguments made and conclusions presented to you on behalf of the Commission in the papers filed March 26, 1992." Commissioner Fleischman resigned from the Commission effective March 31, one day after the date on his letter. Judge Oberdorfer inquired whether Fleischman intended to participate in the hearing on the Rule 27 application. Fleischman wrote on April 14 that he would do so only if the court requested.

Two days later an article appeared in the New York Times, summarizing Fleischman's letters and stating that they followed on the heels of "a profile of Mr. Breeden in Business Week magazine that asserted he had delayed carrying out the commission's decision to reduce sanctions against the accountants. . . ." Stephen Labaton, *Former S.E.C. Member in an Unusual Dissent,* N.Y. TIMES, Apr. 16, 1992, at D19. The newspaper article reported that "senior officials at the commission, speaking on the condition that they not be identified, said that Business Week's account was largely accurate, with the exception of some details." The article also quoted Fleischman as saying that the Business Week account "was sufficiently off so that it can be disavowed." *Id.*

On April 21, 1992, Judge Oberdorfer rejected the Rule 27 application on the ground that petitioners had not made a sufficient showing to satisfy Rule 27(a)(3)'s require-

ment that the perpetuation of testimony was necessary to "prevent a failure or delay of justice." *In re Checkosky,* 142 F.R.D. 4, 7–8 (D.D.C.1992) (footnote omitted).

A

In addition to noting an appeal from Judge Oberdorfer's ruling, Checkosky and Aldrich sought to file a petition for a writ of mandamus with this court seeking the same relief. We rejected the petition because it violated our local page limit rule, now contained in the HANDBOOK OF PRACTICE AND INTERNAL PROCEDURES, UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT, Circuit Rule 27(a)(2). In later orders, we granted petitioners leave to file a mandamus petition by incorporating it and the supporting arguments in their merits brief. *In re Checkosky,* No. 92–5158 (D.C.Cir. Sept. 4, 1992); *In re Checkosky,* No. 92–1214 (D.C.Cir. June 8, 1992). Petitioners have not done so. On the issue of discovery, their brief is devoted entirely to the SEC's final decision rejecting their administrative motion. No argument appears in support of mandamus. It follows that no petition for mandamus is before us.

As to their appeal, Checkosky and Aldrich have presented nothing in support of their Rule 27 application, and for that reason alone the judgment of the district court should be affirmed. *See Rollins Envtl. Servs., Inc. v. EPA,* 937 F.2d 649, 653 n. 2 (D.C.Cir.1991); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983); *see also In re Checkosky,* No. 92–5158 (D.C.Cir. Oct. 14, 1992) (directing the parties to raise all arguments they desired the court to consider in their briefs). As we next discuss, petitioners' Rule 27(a)(3) "delay of justice" theory had in any event rested on a mistaken prophecy—that this court would ultimately set aside the Commission's anticipated rejection of their discovery request.

B

The Commission issued its final decision on August 26, 1992, after reargument. Petitioners' claim of procedural irregularity, the Commission wrote, rested "on uncorrob-

orated and patently untrue hearsay and speculation appearing in a single published article and another article recycling the same allegations." *Checkosky,* ¶ 73,871, at 63,122. The articles were insufficient to overcome the Commission's privilege to keep secret its deliberations on a case. Petitioners, in their discovery motion, had sought: (1) to compel production of draft opinions in the case; memoranda and comments of Commissioners on the drafts; revisions to drafts; minutes and notes of Commission meetings discussing drafts; records of formal and informal votes by Commissioners; documents prepared by the Commission's Office of General Counsel; and other information; and (2) to take the depositions of Commissioners and others regarding these subjects. Such discovery would, in the Commission's view, seriously interfere with its duty to "function as a collegial body and render final decisions only upon the conclusion of all internal discussion on a matter." *Id.* at 63,123.[31]

Agency opinions, like judicial opinions, speak for themselves. And agency deliberations, like judicial deliberations, are for similar reasons privileged from discovery. Subjecting judges to questioning about how they reached their decisions "would be destructive of judicial responsibility." *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). "Just as a Judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected." *Id.* In passing on final agency action, we therefore have refused to consider transcripts of closed agency meetings or "intra-agency memoranda and documents recording the deliberative process leading to" the agency's decision. *Kansas State Network, Inc. v. FCC,* 720 F.2d 185, 191 (D.C.Cir.1983); *San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Comm'n,* 789 F.2d 26, 44 (D.C.Cir.) (in banc), *cert. denied,* 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). Requiring an agency to produce such internal materials and allowing litigants to depose agency officials about such matters would be warranted only in the rarest of cases. This is not such

a case. There is nothing in the Commission's opinion even remotely indicating "bad faith or improper behavior." *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). And the extraneous materials on which petitioners rely do not show, let alone strongly show, anything of the sort.

The New York Times article refers to a "decision" the Commission supposedly reached in 1991, a few weeks after oral argument, "to reduce sanctions against the accountants." On its face, this lends no support to petitioners' claim of improper conduct on the part of Chairman Breeden. Petitioners suppose that the chairman's alleged maneuvering after the vote improperly snatched a victory from them. But when the final order issued in August 1992, the Commission in fact did reduce the sanctions, from five-year suspensions to two-year suspensions. The final outcome also is consistent with the initial vote according to Business Week's account, which reported that three Commissioners had determined "to overturn the harsh sanction" imposed by the ALJ.

Furthermore, it is a misnomer to call the vote after oral argument an agency "decision," as the reporters and petitioners do. "Up to the point of announcement, agency decisions are freely changeable, as are the bases of those decisions." *Pan American World Airways, Inc. v. CAB,* 684 F.2d 31, 36 n. 12 (D.C.Cir.1982) (per curiam). In agencies as in courts, votes are not final until decisions are final; and decisions do not become final until they are released, accompanied by an explanation of the reasons for the result. *See City of Gallup v. FERC,* 702 F.2d 1116, 1123 (D.C.Cir.1983). The record before the Commission in this case was enormous. At issue were "complicated accounting matters involving five different audits over at least four years." *Checkosky,* ¶ 73,871, at 63,122 n. 8. The hearing generated 3,800 pages of transcript and 350 exhibits. Petitioners asked the Commission to rule on 50 separate claims of error in the ALJ's handling of the case; the ALJ's opinion itself

---

**31.** Commissioner Roberts concurred in the decision denying the motion for expedited discovery, "but solely on the ground that expedited discovery is not compelling in view of today's issuance of a final opinion by the Commission in this proceeding." *Checkosky,* ¶ 73,871, at 63,132.

ran for 68 pages. *Id.* It is then scarcely surprising that the Commission did not release a final order, accompanied by a written opinion or opinions, in the few weeks after argument and before Commissioner Lochner departed. Any commissioner may draft an opinion in a case, dissenting or concurring, and the exchange of draft opinions can and does change votes. *Id.* at 63,123 n. 10. The notion—essential to petitioners' charge of misconduct—that only a short time after oral argument a divided Commission had reached something other than merely a tentative decision thus defies belief. It contradicts the sworn affidavit of the Commission's Secretary, filed in the district court and before the SEC as an exhibit to a reply memorandum. And it is supported by nothing in either article.

If the articles do not show bad faith or improper conduct on the part of Chairman Breeden (or anyone else for that matter), what does? Petitioners point to then-Commissioner Fleischman's letter to the district court, in which he expressed disagreement with "arguments made and conclusions presented" in the Commission's opposition to the Rule 27 application to perpetuate testimony pending judicial review in this court. The letter contains no particulars. Nevertheless, we have carefully examined the Commission's opposition to determine what arguments and conclusions Fleischman might have had in mind. Apart from legal matters, the only arguably relevant assertion or "conclusion" we detect—petitioners direct us to no other—is the Commission's statement that no final decision in the administrative case had yet been rendered. But Fleischman could hardly have been disagreeing with that assertion. It was obviously true for the reasons we have already given: Commission decisions do not become final until they are released. Indeed, petitioners themselves relied on this lack of finality in arguing that immediate depositions were needed in the interim to prevent a delay in justice.

In short, we sustain that portion of the Commission's final judgment rejecting petitioners' motion for discovery on the ground that they have failed to mount the requisite strong showing of bad faith or improper conduct.[32]

# VI

## REMANDING WITHOUT VACATING VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

I do not agree that this court has authority to remand this case without vacating the Commission's order. The remand-only disposition, embraced by Judge Silberman, is contrary to law. It rests on thin air. No statute governing judicial review of agency action permits such a disposition and the controlling statute—5 U.S.C. § 706(2)(A)—flatly prohibits it.

Judge Silberman concludes, as I do, that the Commission did not adequately explain its decision suspending Checkosky and Aldrich. He says he cannot figure out whether the Commission decided that negligence is enough. Judge Reynolds and I both know that is exactly what the Commission decided, as does everyone else (*see supra* Part IV.A). No matter. There is still a majority of two for the view that the Commission acted arbitrarily and capriciously.

Judge Silberman, however, is unwilling to face up to the consequences of his analysis. He drags a red herring across the trail by proposing that a reviewing court may simply remand a case to an agency for further proceedings, without determining whether the agency violated § 706(2)(A). Silberman op. at 463. Perhaps so. But I have already determined that the Commission violated § 706(2)(A). And, whether he likes it or not, so has my learned colleague. When Judge Silberman states that the Commission not only neglected to spell out what standard it had applied, but also neglected to reconcile this case with its past decisions, he is saying—despite his disclaimers—that the Com-

---

32. On the basis of the same allegations underlying their request for discovery, petitioners moved to recuse "Chairman Breeden and any member who acquiesced in his actions." Brief for Petitioners at 56. Because the allegations are not sufficiently supported, we sustain the Commission's unanimous rejection of the recusal motion. *Cf. In re United States,* 666 F.2d 690, 695 (1st Cir.1981).

mission acted arbitrarily and capriciously within the meaning of § 706(2)(A). Silberman op. at 458–60. It is firmly settled that if a court must "guess as to what the [agency's] decisional criteria are or should be," the agency's order is arbitrary and capricious. *Airmark Corp. v. FAA*, 758 F.2d 685, 695 (D.C.Cir.1985). Dozens of our opinions have stated this fundamental proposition of administrative law. *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C.Cir.1993), put the matter bluntly: "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result." A representative sample of our other cases on point is set forth in the margin.[33] To this list one must add the Supreme Court's holding in *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579 (1990), that the arbitrary and capricious standard in § 706(2)(A) "mandat[es] that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." The short of the matter is that an agency acts arbitrarily and capriciously when, without sufficient explanation, it departs from its precedent or supports its action with an incoherent statement of reasons, or does both. By Judge Silberman's lights, and by mine, that is what happened in this case.

Once a reviewing court determines that the agency has not adequately explained its decision, the Administrative Procedure Act requires the court—in the absence of any contrary statute—to vacate the agency's action.[34] The Administrative Procedure Act states this in the clearest possible terms. Section 706(2)(A) provides that a "reviewing court" faced with an arbitrary and capricious agency decision "shall"—**not may**—"hold unlawful and set aside" the agency action. *See also* 15 U.S.C. § 78y(a)(3). Setting aside means vacating; no other meaning is apparent. Often we do this simply as a matter of course. *See, e.g., Kooritzky v. Reich*, 17 F.3d 1509, 1514 (D.C.Cir.1994); *American Petroleum Inst. v. EPA*, 906 F.2d 729, 742 (D.C.Cir.1990); *Advanced Micro Devices*, 742 F.2d at 1542–43, 1544.

In a case closely analogous to this one, for example, we vacated a Commission order

---

**33.** *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C.Cir.1994): agency action is arbitrary and capricious "[w]here the agency has failed to provide a reasoned explanation."

*Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1269 (D.C.Cir.1994): in order to avoid acting arbitrarily and capriciously, " 'the agency must . . . articulate a satisfactory explanation . . . .' " (citation omitted).

*Pontchartrain Broadcasting Co. v. FCC*, 15 F.3d 183, 185 (D.C.Cir.1994): "an unexplained departure from Commission precedent would have to be overturned as arbitrary and capricious."

*American Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C.Cir.1992): under the arbitrary and capricious standard "[a]n agency must nevertheless 'examine the relevant data and articulate a satisfactory explanation for its action.' " (citation omitted).

*United States v. Shabazz*, 933 F.2d 1029, 1037 n. 8 (D.C.Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991): "any agency action without reasoned explanation would be arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A)."

*Reliance Elec. Co. v. Consumer Prod. Safety Comm'n*, 924 F.2d 274, 277 (D.C.Cir.1991): "As we held in *Occidental* [*Petroleum Corp. v. SEC*, 873 F.2d 325 (D.C.Cir.1989)], the agency therefore 'must produce an administrative record that delineates the path by which it reached its decision.' 873 F.2d at 338. When the agency has not done so, the proper course is to vacate and remand for an explanation."

*NTEU v. Horner*, 854 F.2d 490, 498 (D.C.Cir. 1988): "Stated most simply, our task [under the arbitrary and capricious standard] is to determine 'whether the agency's decisionmaking was reasoned.' " (citation omitted).

*Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1326 (D.C.Cir.1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989): in order not to act arbitrarily and capriciously, "the agency must articulate a satisfactory explanation for its action."

*Graphic Communications Int'l Union, Local 554 v. Salem–Gravure*, 843 F.2d 1490, 1493 (D.C.Cir.1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989): an agency acts arbitrarily and capriciously when it departs from "precedent without a reasoned explanation . . . ."

**34.** This is no mere technical quibble. Checkosky and Aldrich are currently serving a two-year suspension because of an unlawful agency order. Since we remand without vacating, all indications are that their suspensions will be fully served by the time the Commission gets around to repairing its opinion, or changing its mind about whether they violated Rule 2(e).

sanctioning a broker-dealer for the same reasons Judge Silberman gives in his separate opinion: "The discussion in the order is simply too brief to enable this court to determine if the sanction was based on a consideration of all the relevant factors and is in accord with Commission precedent." *Nassar & Co. v. SEC*, 566 F.2d 790, 794 (D.C.Cir. 1977).

Judge Silberman does not parse the language of § 706(2) and he does not distinguish *Nassar* and the many other cases I cite in this section. He simply points to a line of circuit decisions apparently heading in another direction. Some, but far from all of the cases he mentions, do appear to order a remand only despite finding agency action arbitrary and capricious. But none of these decisions, not one, faced the question whether § 706(2)(A) permitted such a disposition. For that reason, the cases are "inconsequential for precedential purposes." *Grant v. Shalala*, 989 F.2d 1332, 1341 (3d Cir.1993). The Supreme Court held long ago that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925). *See also Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 183, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979); *Stapf v. United States*, 367 F.2d 326, 330 (D.C.Cir. 1966).

On the other hand, when we have confronted the question, our decisions uniformly—and quite firmly—hold that § 706(2)(A) requires us to vacate the arbitrary and capricious agency action. In decision after decision, we have held that under § 706(2)(A), the reviewing court "must" set aside such agency action.[35] As we held in *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1497 (D.C.Cir.1988) (emphasis added), "[p]ursuant to the Administrative Procedure Act, courts are instructed *always* to 'hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary [or] capricious....' 5 U.S.C. § 706(2)(A)."

Furthermore, the Supreme Court has interpreted § 706(2)(A) to mean what it says. In one of its leading administrative law cases, the Court held this: "In *all* cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements. 5 U.S.C. §§ 706(2)(A), (B), (C), (D)." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971) (emphasis added). The Court in *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), said much the same, holding that if a "finding is not sustainable [under § 706(2)(A) ] on the administrative record made, then the [agency's] decision must be vacated and the matter remanded ... for further consideration." *See also NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 804, 110 S.Ct. 1542, 1558, 108 L.Ed.2d 801 (1990) (Scalia, J., dis-

---

35. *See, e.g., Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C.Cir.1994); *Laclede Gas Co. v. FERC*, 997 F.2d 936, 945 (D.C.Cir. 1993); *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 337 (D.C.Cir.1989); *MCI Telecommunications Corp. v. FCC*, 842 F.2d 1296, 1300 (D.C.Cir.1988); *NLRB Union v. FLRA*, 834 F.2d 191, 197 (D.C.Cir.1987); *CMC Real Estate Corp. v. ICC*, 807 F.2d 1025, 1030 (D.C.Cir.1986); *American Fed'n of Gov't Employees, Local 2544 v. FLRA*, 779 F.2d 719, 723 n. 7 (D.C.Cir.1985); *All America Cables & Radio, Inc. v. FCC*, 736 F.2d 752, 760 (D.C.Cir.1984); *Southern Pac. Transp. Co. v. ICC*, 736 F.2d 708, 714 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1171, 1172, 84 L.Ed.2d 322 (1985); *Electronic Indus. Ass'n Consumer Elecs. Group v. FCC*, 636 F.2d 689, 696 n. 13 (D.C.Cir.1980); *National Tire Dealers & Retreaders Ass'n v. Brinegar*, 491 F.2d 31, 37 (D.C.Cir.1974); *WLVA, Inc. v. FCC*, 459 F.2d 1286, 1301 n. 54 (D.C.Cir.1972); *Columbia Broadcasting Sys., Inc. v. FCC*, 454 F.2d 1018, 1028 (D.C.Cir.1971).

Decisions using language similar to "must" also abound. *See, e.g., American Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C.Cir.1992); *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1454 n. 5 (D.C.Cir.1992); *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1497 (D.C.Cir.1988); *Ingersoll–Rand Co. v. United States*, 780 F.2d 74, 77 n. 7 (D.C.Cir.1985); *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C.Cir.1985); *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1372 (D.C.Cir.1985); *Belland v. Pension Benefit Guar. Corp.*, 726 F.2d 839, 844 (D.C.Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984).

senting) ("Among the attributes of formal adjudication relevant here, ... a reviewing court must 'hold unlawful and set aside agency action, findings, and conclusions found to be ... unsupported by substantial evidence.'"); *Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 97 n. 7, 104 S.Ct. 439, 444 n. 7, 78 L.Ed.2d 195 (1983); *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 226, 229, 100 S.Ct. 497, 499, 500, 62 L.Ed.2d 433 (1980).[36]

In the face of § 706(2)'s command that the reviewing court "shall" "set aside" arbitrary and capricious agency action, we have no choice but to vacate the Commission's suspension order.[37] To order only a remand despite the APA's mandate is to act in stubborn defiance of the law. Agencies must conform their actions to the APA. So must courts.

REYNOLDS, District Judge, concurring in part with and dissenting in part from Judge SILBERMAN'S and Judge RANDOLPH'S opinions: For the following reasons, the decision of the Securities and Exchange Commission should be affirmed.

## I. INTRODUCTION

I concur with my colleagues' holdings that the Commission has the authority to issue Rule 2(e), that the evidence supports the Commission's findings, and that discovery into the Commission's deliberations is inappropriate. I dissent from their conclusions regarding scienter and Rule 2(e)(1)(ii). I do not believe that the SEC acted arbitrarily or capriciously when it found Checkosky and Aldrich negligent and suspended them under Rule 2(e)(1)(ii).

## II. THE COMMISSION'S AUTHORITY TO ISSUE RULE 2(e)

The Commission has the authority to issue Rule 2(e) in order to "protect the integrity of its own processes" (e.g. to assure honest and accurate financial filings) by revoking the privileges of professionals whose conduct threatens those processes. *See Touche Ross, & Co. v. SEC,* 609 F.2d 570, 582 (2d Cir. 1979); *Davy v. SEC,* 792 F.2d 1418, 1421 (9th Cir.1986). This authority emanates from the Commission's broad rulemaking power to implement the Act and the SEC's mandate to protect the investing public.[1] Rule 2(e) is separate from the SEC's arsenal against violations of the Act's substantive provisions,[2] because suspensions under the Rule are necessary to aid the Commission in the regulation and administration of the Act, and are not actions for punishment or relief under the substantive provisions of the securities laws.[3] *See Touche Ross,* 609 F.2d at 579.

As Section IV explains, the Commission's authority to protect itself extends to cases such as the one at bar, in which the SEC has found that negligent improper professional conduct, which results in $37 million worth of errors in five financial statements over a

---

**36.** Our court seems to have gone astray in *Independent U.S. Tanker Owners Committee v. Dole,* 809 F.2d 847, 854 (D.C.Cir.1987), which Judge Silberman prominently displays in his opinion, at p. 465. Of course we did not there come to grips with § 706(2)(A). Instead, we cited *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 701, 703–04 (2d Cir.1975), for the idea that a court may remand without vacating after finding unlawful agency action. The Second Circuit's decision, however, does not support the proposition for which it was invoked. The court in *National Nutritional Foods* remanded the case not to the agency, but to the district court so that it could determine whether the agency had acted arbitrarily.

**37.** If the agency believes that vacating its order or rule would cause difficulties, it has the option of applying for a stay of the mandate, at which point it may make its arguments regarding irreparable harm and other considerations. This is the usual and appropriate method of handling such matters, which are rarely the subject of briefing or argument at the petition-for-review stage.

**1.** *See* 15 U.S.C. § 78w(a)(1); 15 U.S.C. § 77s(a).

**2.** The district courts have exclusive jurisdiction over violations of the Act itself. *Touche Ross,* 609 F.2d at 579 (citing 15 U.S.C. §§ 78aa & 77v(a)).

**3.** Further, only Rule 2(e)(1)(iii) conditions suspensions upon willful violations of, or wilfully aiding and abetting violations of, the federal securities laws.

four-year period, merits Rule 2(e)(1)(ii) suspensions.[4]

## III. SUFFICIENCY OF THE EVIDENCE

The SEC found that Checkosky and Aldrich were *at least* negligent in failing to adhere to GAAP and to conduct their audits in accordance with GAAS.[5] The evidence overwhelmingly supports the SEC's findings. The facts recited in Judge Randolph's opinion amply reveal the foundation for this conclusion, and Judge Silberman's additions reinforce the point.

## IV. RULE 2(e)(1)(ii) AND SCIENTER

The SEC did not have to find scienter to invoke Rule 2(e)(1)(ii) in this case. This position is completely consistent with the SEC's mission and has not been rejected by courts interpreting the SEC's power to implement Rule 2(e).[6] With the exception of Rule 2(e)(1)(iii), regarding willful aiding and abetting, the language of Rule 2(e) does not require that the Commission find scienter before suspending a professional's privilege to practice before it. Furthermore, past SEC decisions do not dictate that the Commission find scienter in this case.

### A. *Carter* Is Not Inconsistent With This Case

The Commission has never made the all-encompassing ruling that scienter is necessary for all suspensions under Rule 2(e). Its broadest statement of such a requirement came in *In re Carter*, where the Commission pronounced that scienter was a necessary element to willful aiding and abetting under Rule 2(e)(1)(iii). [1981 Tr.Binder] Fed.Sec.

L.Rep. (CCH) ¶ 82,847 at 84,167 (Feb. 28, 1981). Rule 2(e)(1)(i) & (ii) are not based upon "willfulness," and therefore the *Carter* pronouncement should not be read to extend to those subsections.

Further, when the SEC interpreted Rule 2(e)(1)(ii) in *Carter*, it found "no unfairness whatsoever in holding those professionals who practice before [it] to generally recognized norms of professional conduct." *Id.* at 84,170.

To the extent that the *Carter* decision can be read to require a finding of scienter for lawyers in certain circumstances, that decision is quite a narrow one.[7] When the Commission interpreted Rule 2(e)(1)(ii) regarding improper conduct in *Carter*, it stated as an introduction to the analysis that its focus was upon the "professional obligations of the lawyer who gives essentially correct disclosure advice to a client that does not follow that advice and as a result violated the federal securities laws." *Id.* ¶ 82,847, at 84,170–84,-171. The Commission went to great lengths to explain that the corporate lawyer is "only an adviser, and the final judgment—and, indeed, responsibility—as to what course of conduct is to be taken must lie with the client." *Id.*

It is in this context that the *Carter* decision stated that improper professional conduct under Rule 2(e)(1)(ii) does not apply so long as the lawyer counsels accurate disclosure. The Commission explained that:

[A] lawyer engages in "unethical or improper professional conduct" under the following circumstances: When a lawyer with significant responsibilities in the effectua-

---

4. The SEC approved the ALJ's ruling, which found that negligence sufficed to invoke the Rule, and the Commission further stated that "proof of bad faith or willful misconduct is not a prerequisite for the imposition of sanctions pursuant to Rule 2(e)(1)(ii)." *In re Checkosky*, Fed.Sec. L.Rep. (CCH) ¶ 73,871 at 63,121 (Aug. 26, 1992). Thus, the SEC adequately stated the standard which it was applying—negligence.

5. Although the SEC found negligence in this case, my concurrence should not be read to subscribe to the view that the SEC must *always* find negligence before suspending an accountant for improper conduct. There may be cases in which the magnitude of errors alone would be

sufficient to invoke Rule 2(e)(1)(ii). That issue is not before us, however.

6. *Touche Ross* does not reach the issue of the Commission's authority to suspend accountants for negligent behavior. *Davy* and *Danna & Detinger v. SEC*, No. C–93–4158, mem. op. at 3–4, 5 n. 2, 1994 WL 315877 (N.D.Cal. Feb. 8, 1994) support a finding of such authority.

7. The narrow *dictum* in the 1942 SEC decision in *In re Logan*, 10 S.E.C. 982 (1942), is even more inapposite as a basis for forcing the SEC to revisit this case.

tion of a company's compliance with the disclosure requirements of the federal securities laws becomes aware that his client is engaged in a substantial and continuing failure to satisfy those disclosure requirements, his continued participation violates professional standards unless he takes prompt steps to end the client's noncompliance.

*Id.* ¶ 82,847 at 84,172–73.

After making this announcement, the Commission discussed whether this meant that whenever a client chooses not to comply with the advice of counsel, it becomes necessary for a lawyer to resign. Only under those circumstances did the SEC state that "[s]o long as a lawyer is acting in good faith and exerting reasonable efforts to prevent violations of the law by his client, his professional obligations have been met." *Id.* *Carter* thus presents this court, the Commission, and professionals practicing before the Commission with an interpretation of Rule 2(e)(1)(ii) in a very narrow set of circumstances.

The facts of *Carter* are not comparable to those of the case at bar. The *Carter* case should not be used as a screen for those professionals (including lawyers) [8] who fail to do their duty to investigate, and then file financial statements with the Commission and certify them as correct when they contain egregious errors. *That* is what the law judge and the Commission found happened in this case. Thus, we should not send it back for further explanation of why accountants differ from lawyers or for a more definite standard than the SEC set forth in its decision.

### B. The Commission Adequately Distinguished *Carter*

Moreover, even if we assume that the SEC *needed* to explain the difference between *Carter* and this case, the Commission did so

sufficiently. Whatever the boundaries of *Carter* as applied to lawyers, the Commission specifically held that it need not find bad faith or willful misconduct in order to find that an accountant acted improperly. *Checkosky,* ¶ 73,871, at 63,121. In so declaring, the SEC reaffirmed its prior statement in *In re Haskins & Sells,* [9] that scienter is not required for the imposition of sanctions against accountants in a Rule 2(e) proceeding.

The SEC decision in this case distinguished the *Carter* ruling by noting that even *Carter* acknowledged that:

Accountants, of course, issue audit reports that speak directly to the investing public and publicly represent that the code of conduct embodied in the statements of auditing standards promulgated by the AICPA has been followed. *The duty of accountants to those who justifiably rely on those reports is well-recognized. But the traditional role of the lawyer as counselor is to advise his client, not the public, about the law.*

*Checkosky,* ¶ 73,871, at 63,130 (emphasis added) (quoting *Carter,* ¶ 82,847, at 84,150).

The auditor has an overriding duty to the investing public not to represent that a financial statement is presented in conformity with generally accepted accounting principles if it is not.[10] When CPAs certify audits, the investing public relies on their objectivity and integrity to maintain order in commerce.[11] If any explanation of a "departure" from *Carter* was necessary, the SEC provided us with a rational one. The SEC did not act arbitrarily or capriciously in this matter.

### V. DISCOVERY INTO THE COMMISSION'S DELIBERATIONS

I join in Section V of Judge RANDOLPH'S opinion regarding discovery into the Commission's deliberations.

---

**8.** The *Carter* decision should not even apply to a lawyer who files false statements with the SEC, at least when the lawyer fails to attempt to verify the accuracy of the statements and to counsel honesty.

**9.** [1937–1982 Accounting Series Releases Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 72,092 at 62,197 (Oct. 30, 1952).

**10.** Code of Professional Conduct, Rules 202, 203, 301.

**11.** *See id.,* Art. II.

## VI.  DISPOSITION OF THE CASE

The SEC decision should be affirmed.  If this case is remanded, the SEC decision should not be vacated until this court overrules it.